STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. LARRY IRVING, DEFENDANT–APPELLANT.

Argued December 1, 1987—Decided March 30, 1989.

428

430

*Jeffrey B. Steinfeld,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney; *Jeffrey B. Steinfeld* and *James B. Flynn,* Designated Counsel, on the briefs; *Larry Irving* submitted a supplemental brief, *pro se* ).

*Marc J. Friedman,* Assistant Prosecutor, argued the cause for respondent (*Herbert H. Tate, Jr.,* Essex County Prosecutor, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 108 *N.J.* 175 (1987), to review the Appellate Division's resolution of several important issues raised in defendant's appeal from judgments of conviction, after a jury trial, on several criminal charges.   Those issues arose from the cross-examination of defendant on the basis of his original notice of alibi, from the prosecutor's comment in summation on defendant's failure to produce an alibi witness, and from a detective's testimony about "information" that led the police to consider defendant a suspect.

I

At about 8:00 a.m. on September 22, 1983, three armed men, one of whom was later identified as the defendant, Larry Irving, held up Frisco's Luncheonette in Newark.   In the course of the robbery defendant shot and wounded the proprietor, Vito Frisco, despite which Frisco and a long-time employee, Clarence Tutt, gave chase but were unable to catch the robbers.

Shortly after the robbery, Detective Colicelli of the Newark Police Department canvassed the neighborhood surrounding Frisco's Luncheonette, "putting the word out" about the crime. He asked that anyone having information communicate with him at the department.   Based on information that he obtained, Detective Colicelli included Larry Irving's picture in a six-person photo array, showed it to Frisco and later to Tutt.   Both identified Irving as the person who robbed the luncheonette. Frisco added that Irving was the man who shot him.   From another array, Frisco and Tutt identified Grady Livingston as defendant's accomplice.

At trial, Irving maintained that he could not have committed the crime because he was on his way to work at the Essex County Public Works Department in Orange, New Jersey. He testified that he left his apartment in Newark a few minutes before 8:00 a.m., the same time that his roommate, Dexter Davis, left for his teaching position. He contended that the drive to work consumed a substantial amount of time, and an investigator testified on defendant's behalf that the trip required twenty-five to twenty-seven minutes. Defendant's employer produced Irving's time-card from work, stamped at 8:16 a.m. Lacking, however, was the testimony of Dexter Davis, the only witness who could support Irving's assertion that he was at his apartment until 8:00 a.m. Not surprisingly, the prosecutor seized on the opportunity to inquire on cross-examination about Davis's absence and to comment on it in her summation.

The jury convicted the defendant, along with Livingston, of first-degree robbery, contrary to *N.J.S.A.* 2C:15–1; second-degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1); third-degree unlawful possession of a weapon without a permit, contrary to *N.J.S.A.* 2C:39–5b; and second-degree unlawful possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a. On the robbery conviction, to which the Graves Act, *N.J.S.A.* 2C:43–6(c), was found applicable, the court sentenced defendant to a custodial term of eighteen years with seven years of parole ineligibility. On the aggravated assault conviction, defendant received a consecutive custodial term of seven years with three years of parole ineligibility. The court merged the unlawful weapons possession charge with the robbery and aggravated assault convictions. The remaining weapons possession charge was to be served concurrently with the robbery and assault convictions.

Although the Appellate Division, in an unreported opinion, affirmed the convictions, it agreed with defendant that in keeping with *State v. Yarbough*, 100 *N.J.* 627 (1985), *cert.* den., 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), the trial

court should have explained its reasons for imposing a consecutive sentence on the aggravated assault conviction. On remand the court explained in detail its reasons for the consecutive terms and imposed the same sentence.

## II

Under Rule 3:11–1 a defendant who intends to rely on an alibi shall, on written demand of the prosecuting attorney and within 10 days thereafter, furnish a written bill of particulars, signed by him, stating the specific place or places at which he claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

In exchange for this information, and on written demand by the defendant, the prosecutor must furnish the names and addresses of witnesses on whom the State intends to rely to establish defendant's presence at the scene of the alleged offense. *Ibid.* A party may amend the bill of particulars pursuant to a court order. *Ibid.*

█ The purpose of a notice of alibi is "to avoid surprise at trial by the sudden introduction of a factual claim [that] cannot be investigated unless the trial is recessed to that end." *State v. Garvin*, 44 *N.J.* 268, 272–73 (1965). The sanction for noncompliance with the Rule is that the defaulting party may be precluded from presenting witnesses at trial regarding defendant's absence from or presence at the scene of the alleged offense. *R.* 3:11–2.

With counsel's assistance, in late February 1984 defendant filed an original notice of alibi containing the names of his co-workers at the Public Works Department. Defendant signed the notice in accordance with *Rule* 3:11–1. On April 9, 1984, his defense counsel amended the notice by letter to include the name of Dexter Davis, defendant's roommate.

At trial, the prosecutor attempted to cross-examine the defendant on the contents of the original notice of alibi. Defense counsel objected. In a sidebar colloquy, the prosecutor explained that her purpose was two-fold: to indicate to the jury

that no witnesses were called in support of the defendant's alibi, and to bring to the jury's attention the fact that Dexter Davis had not been included in the original notice. Before determining whether such questioning was proper, the court asked the prosecutor to examine Irving on voir dire. Concluding that the prosecutor's questions went to the issue of defendant's credibility, the court permitted the cross-examination to proceed before the jury.

During that examination defendant admitted that he had not provided Davis's name to his counsel until one month after he had offered the names of his co-workers. He agreed that Davis was the only witness who had seen him before 8:00 a.m. on the day of the robbery. On re-direct, defendant explained that because of his incarceration, he was unable to speak to any other witnesses before signing the original notice. However, he was never questioned about why Davis did not appear at trial.

In *State v. Angeleri*, 51 *N.J.* 382 (1968), this Court held that a notice-of-alibi requirement did not violate a defendant's right against self-incrimination. The rationale was that the Rule did not compel a defendant to say anything, but rather merely required pretrial disclosure if the defendant planned to assert an alibi. *Id.* at 384–85. The Court added that "if an alibi should tend to incriminate an accused, it must be because of its inherent infirmity. The Constitution does not protect a defendant from the consequences of a defense he makes, nor assure him a right so to defend as to deny the State a chance to check the truth of his position." *Id.* at 385.

Two years after *Angeleri*, the United States Supreme Court was presented with *Williams v. Florida*, 399 *U.S.* 78, 90 *S.Ct.* 1893, 26 *L.Ed.*2d 446 (1970), in which defendant challenged Florida's notice-of-alibi rule as violating his right against self-incrimination. The defendant in *Williams*, after being denied a protective order by the trial court that would excuse him from complying with the State's notice-of-alibi rule, eventually pro-

vided the name of a Mary Scotty as his alibi witness. *Id.* at 81, 90 *S.Ct.* at 1895, 26 *L.Ed.*2d at 449. The prosecutor subpoenaed Mrs. Scotty and deposed her prior to trial. The testimony of Williams, his wife, and Mrs. Scotty at trial was that the three were together in Mrs. Scotty's apartment at the time of the alleged robbery. *Ibid.* During Mrs. Scotty's cross-examination, however, she gave testimony that was inconsistent with her deposition. Moreover, rebuttal testimony was provided by a police officer who challenged Mrs. Scotty's location at the time of the alleged robbery. *Id.* at 81, 90 *S.Ct.* at 1896, 26 *L.Ed.*2d at 449–50.

The Supreme Court affirmed the Florida Supreme Court's determination that the notice-of-alibi rule did not violate defendant's right against self-incrimination by providing information "useful in convicting him." *Id.* at 82, 90 *S.Ct.* at 1896, 26 *L.Ed.*2d at 450. The Court stated:

Nothing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice. That choice must be made, but the pressures that bear on his pretrial decision are of the same nature as those that would induce him to call alibi witnesses at the trial: the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not *compelled* self-incrimination transgressing the Fifth and Fourteenth Amendments.

[*Id.* at 84–85, 90 *S.Ct.* at 1897–98, 26 *L.Ed.*2d at 451–52 (emphasis added) (footnote omitted).]

Thus, "[h]owever 'testimonial' or 'incriminating' the alibi defense proves to be, it cannot be considered 'compelled' within the meaning of the Fifth and Fourteenth Amendments." *Id.* at 84, 90 *S.Ct.* at 1897, 26 *L.Ed.*2d at 451; *see United States v. Washington*, 431 *U.S.* 181, 187, 97 *S.Ct.* 1814, 1818, 52 *L.Ed.*2d 238, 245 (1977) ("Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions."). The decision whether to file the notice, according to the Court in *Williams,* was no different from a defendant's decision to testify or to remain silent—a dilemma that has "never been thought an invasion of the privilege

against compelled self-incrimination." *Williams, supra,* 399 *U.S.* at 84–85, 90 *S.Ct.* at 1897–98, 26 *L.Ed.*2d at 451. Justice O'Hern's assertion that the only justification for the notice-of-alibi rule is as a *"non-testimonial* event," *post* at 465, is therefore wide of the mark. The justification for the rule, under *Williams,* is that it does not compel self-incriminating testimony.

It has been argued that the *Williams* analysis is inapplicable to this context, where "litigational use" is made of the notice. See Justice Handler's dissent, *post* at 453. He urges an entirely different analysis under the fifth amendment, one that would hold that when a defendant is cross-examined on the content of the notice of alibi for impeachment purposes, the defendant's testimony is "compelled" and therefore self-incriminating. We fail to see how cross-examination concerning the content of a notice-of-alibi is so entirely different from the cross-examination of a witness whose name was derived from the content of the notice itself as to transgress the boundaries of the fifth and fourteenth amendments.

Borrowing from an interesting, if somewhat theoretical, law-review article, Justice Handler's dissent attempts to explain the alleged constitutional violation by classifying this case as a form of "indirect or conditional compulsion," which occurs "when a burden is placed on the otherwise unconditional right to remain silent, such that the right is no longer considered truly 'voluntary.'" *Post* at 451–452. He admits, however, that the circumstances of this case do not rise to the level of a "pristine compulsion." Even assuming we were to accept this analytical model—which we do not—the same classification could be attached to *Williams.* Artificial constructs aside, we think that the United States Supreme Court has made clear that not every burden on the exercise of fifth-amendment rights is unconstitutional. *See McGautha v. California,* 402 *U.S.* 183, 213, 91 *S.Ct.* 1454, 1470, 28 *L.Ed.*2d 711, 729 (1971) ("The threshold question is whether compelling the election [between self-incrimination and the right to remain silent] impairs to an

of the policies behind the rights involved.") We conclude that the use of the notice of alibi in the instant case has not appreciably impaired the policies underlying defendant's right to remain silent or his right against self-incrimination.

Inasmuch as the notice is not self-incriminating, the question then becomes whether the contents of the notice may be used as a basis for testing a defendant's credibility on cross-examination. That question focuses on whether the notice is sufficiently testimonial in character. Defendant contends that it is not. He urges the Court to view the document as a formal pleading that was not intended as an affirmative statement. The argument is unconvincing because the notice contains highly relevant information amassed from statements volunteered by the defendant in preparation for an alibi defense. Although defense counsel assisted in the act of recording the plea of alibi, counsel could not have developed the information contained therein independently. Moreover, the characterization of the notice of alibi as a formal pleading does not advance the defendant's position inasmuch as factual assertions in pleadings or in superseded pleadings may be used against the parties who made the assertions. *Stoelting v. Hauck*, 32 *N.J.* 87, 107 (1960). (We do not suggest, however, that an omitted name in a notice of alibi can be viewed as an admission against interest. *Evid. R.* 63. We cite *Stoelting* merely to point out the logical flaw in the defendant's analysis.)

The testimonial nature of the notice of alibi is clear from the defendant's signature on the document. This signature serves as a certification of the truth of the contents of the notice and as an acknowledgement that the defendant voluntarily participated in the preparation of his alibi defense. The importance of defendant's signature cannot be understated, for under *Rule* 3:11-1 the notice is void without it.

Defendant suggests that it is inherently unfair to allow cross-examination regarding a document that he was required

to file before his defense counsel had an opportunity to complete his investigation of the case. To this argument there are two responses. First, the trial court can balance any prejudice that the defendant would suffer as a result of the precipitant nature of the plea against the probative value of the information pursuant to an *Evidence Rule* 4 analysis, as was done in this case. Second, because the notice is capable of being amended prior to trial, defendant may alter the list to accord with his investigation. True, defendant may have to explain any contradictions in the original notice, but the jury is entitled to determine where the truth lies. If legitimate doubt is cast, that is the risk that a defendant assumes by asserting an alibi defense.

It must be emphasized that the information contained in the notice was not offered for substantive purposes nor as part of the State's main case. *See also Williams, supra,* 399 *U.S.* at 86 n. 17, 90 *S.Ct.* at 1898 n. 17, 26 *L.Ed.*2d at 452 n. 17 (suggesting that "testimonial" disclosure protected by the fifth amendment "includes only statements relating to the historical facts of the crime," not statements relating to trial strategy); *Conn.Super.Ct.R.* § 772 (limiting State's use of evidence discovered through defendant to cross-examination or rebuttal); *cf., e.g., Gilbert v. California,* 388 *U.S.* 263, 87 *S.Ct.* 1951, 18 *L.Ed.*2d 1178 (1967) (handwriting exemplars admitted as part of the State's case). Moreover, the information in the notice was unrelated to any element of the offense. *See, e.g., Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966) (compulsory blood sample used to establish essential element of charge against defendant). In *State v. Miller,* 67 *N.J.* 229 (1975), this Court held that a statement taken without full *Miranda* warnings, see *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), although not admissible on the State's case-in-chief, may be used to impeach defendant's credibility as a witness "should the defendant take the witness stand and give testimony which is at variance with what was said in the statement to the police." *Id.* at 233 (citing

*Harris v. New York*, 401 *U.S.* 222, 91 *S.Ct.* 643, 28 *L.Ed.*2d 1 (1971)). We see in *Miller* an analogy to this case, where the only purpose for the use of the notice of alibi was to impeach Irving's credibility.

■ Our analysis of the issue does not end, however, with a determination that the original notice of alibi was a testimonial statement. To be admissible, the statement must come within an exception to the hearsay rule. *Evid.R.* 63. Under *Evidence Rule* 63(1) "[a] statement is admissible if previously made by a person who is a witness at a hearing, provided it would have been admissible if made by him while testifying and the statement: (a) is inconsistent with his testimony at the hearing * * *." The inconsistency exists in this case between defendant's trial testimony, in which Dexter Davis is admitted to be the key to the alibi defense, and the contents of the original notice of alibi, which fails to include Davis's name.

Defendant argues that there is no inconsistency inasmuch as the notice-of-alibi form in Essex County states: "the following witnesses may or may not be called to testify." Because the notice does not specifically state that the witnesses will testify, he urges, it is not inconsistent with defendant's trial testimony. However, *Rule* 3:11–1 unequivocally requires a defendant to furnish a list of witnesses "upon whom he [the defendant] intends to rely." The focus of the Rule is the defendant's intent to rely on the specified persons, not whether they are in fact called. If that intent materially changes during the preparation of the alibi, that inconsistency should be revealed.

Our holding today does not alter the decision in *State v. Gross*, 216 *N.J.Super.* 92 (App.Div.), certif. den., 108 *N.J.* 194 (1987). In *Gross* the defendant did not testify at trial. The prosecutor nevertheless had the notice of alibi admitted into evidence and argued in summation that the reason a witness named in the notice did not appear was to avoid perjuring herself. The court held that

[w]here, as here, a defendant does not suggest at trial that a person named in his alibi notice has any relevant information in support of the defense, the notice cannot fairly be used to imply that defendant had untruthfully made such a claim or that the person thus named would testify unfavorably to defendant if called.

[216 *N.J.Super.* at 96.]

A footnote appended to this sentence stated, "We need not and do not determine whether an alibi notice may be used by the State as substantive or impeachment evidence in any other setting." *Id.* at 96 n. 1. Unlike the situation in *Gross,* Irving testified that Dexter Davis was in the apartment with him on September 22, and that the two left for work at approximately the same time. There was no unfairness in allowing cross-examination on the information because the clear import of Irving's testimony was that Davis could supply the critical link in his alibi and thereby bolster his credibility.

Although in *State v. Garvin, supra,* 44 *N.J.* 268, the Court stated that the purpose of the notice of alibi was to "avoid surprise at trial," it did not limit the use of the notice of alibi to pretrial discovery purposes. Unlike Wisconsin, which statutorily prohibits cross-examination on the contents of the notice of alibi, *Wis.Stat.Ann.* § 971.23(8) (West 1985), New Jersey has not placed any restraints on the use of the notice beyond a standard *Evidence Rule* 4 analysis. The information contained in a notice of alibi is no different from facts asserted in a motion to suppress or dismiss, or in an affidavit filed with such motions: they are statements by the defendant and subject to cross-examination if inconsistent with his trial testimony.

■ Contrary to the dissent's charge, the Court's decision today does not allow "the deposing in pretrial of all defendants who plan to assert a defense in order to allow the prosecution to prepare against surprises and to improve the truth-finding process." *Post* at 466. Our holding is a narrow one: we determine only that when a voluntary decision has been made to assert an alibi defense and to file a notice of alibi, the information contained in that notice may be subject to cross-ex-

amination, subject, as always, to the court's discretionary control of the scope of the cross-examination, *see, e.g., State v. Petillo*, 61 *N.J.* 165, 169 (1972), and provided a trial court has first found that the prejudicial effect of the information does not outweigh its probative value.

## III

We turn to the issue of whether it was plain error for the trial court to allow the prosecutor to comment in her summation to the jury on defendant's failure to produce Dexter Davis as an alibi witness. More specifically, we must determine whether the failure to produce Davis was an appropriate subject of comment, and whether the prosecutor followed the proper procedures to allow the drawing of an adverse inference, as set forth in *State v. Clawans*, 38 *N.J.* 162 (1962). Although we conclude that the prosecutor's actions offended the procedural standard set forth in *Clawans*, the violation did not rise to the level of plain error. *R.* 2:10–1.

During her summation, without notice to anyone, the prosecutor stated:

> He (the defendant) told you there's somebody who could corroborate that, Dexter Davis left the house just before Larry Irving did. Larry Irving left the house a few minutes after 8:00. Dexter Davis could say I left the house at 8:00 and Larry Irving was still there. Larry Irving saw Dexter Davis Tuesday. Where is Dexter Davis, the only person who could corroborate that was never brought before you, why not? Ask yourselves.

In *Clawans* the Court explained that

> [f]or an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved.
>
> [38 *N.J.* at 171 (citations omitted).]

The opinion pointed out obvious departures from this two-part standard. The inference was not proper if, for example, the witness was a person "whose testimony would be cumulative, unimportant or inferior to what had been already utilized." *Ibid.* (citations omitted).

Of equal importance in *Clawans* was the procedure to be followed in requesting a jury charge for adverse inference. The concern was to provide the party accused of non-production an opportunity either to call the witness or to explain his failure to do so. This concern could be met if

> the party seeking to obtain a charge encompassing such an inference [were to] advise the trial judge and counsel out of the presence of the jury, at the close of his opponent's case, of his intent to so request and demonstrat[e] the names or classes of available persons not called and the reasons for the conclusion that they have superior knowledge of the facts.
>
> [38 *N.J.* at 172.]

We applied *Clawans* to the context of statements made on summation regarding an adverse inference in *State v. Carter*, 91 *N.J.* 86 (1982). Again, we urged that parties request the court to make the inference out of the presence of the jury and at the close of the opponent's case. We stated: "It is only after all the particulars are disclosed that the trial court may properly determine whether the inference should be urged in summation." *Id.* at 128; *see also State v. Driker*, 214 *N.J.Super.* 467, 472 (App.Div.1987) (prosecutor's reference in summation to defendant's failure to call witness held proper where prosecutor requested *Clawans* charge at conclusion of defendant's case).

Defendant asserts that under *Clawans* the prosecutor's statement was impermissible because Davis's testimony would have been merely cumulative, as well as inferior to the testimony given by defendant. But the suggestion is plainly wrong. Only Dexter Davis could corroborate defendant's alibi that he did not leave for work until approximately 8:00 a.m. and that it was therefore impossible for him to commit the crime and arrive at work by 8:16 a.m. Although we cannot say that Davis would have been a disinterested witness, his testimony would have been clearly superior to defendant's self-serving declarations at trial regarding his departure time.

As an alternative contention defendant urges that because Davis was available to both parties inasmuch as his name was

disclosed on the notice of alibi, the inference should not have
been permitted. That conclusion is contrary to *Clawans*, where
the Court made clear that a possible inference may be drawn
against both parties if a witness is equally available, "de-
pend[ing] on the circumstances of the case, including whether
one party has superior knowledge of the identity of the witness
and what testimony might be expected from him, as well as the
relationship of the witness to the parties." 38 *N.J.* 171–72.
Although Dexter Davis was physically available to both parties
through the reach of a subpoena, his relationship with Irving as
friend and roommate supports an assertion against Irving re-
garding his absence at trial. As stated in *United States v.
Blakemore*, 489 *F.*2d 193 (6th Cir.1973), "There may be a
relationship of such description (legal, personal, practical or
perhaps even social) between a prospective witness and one
party that would in a pragmatic sense make his testimony
unavailable to the opposing party regardless of physical avail-
ability." *Id.* at 195 n. 4. We therefore conclude that Davis's
absence was an appropriate subject for the prosecutor to com-
ment on during her summation.

However, we agree with the defendant's contention
that the procedural standards suggested in *Clawans* and in
*Carter* were not followed. Although the procedure has never
been denominated a "requirement," the expectation was that as
a matter of professional conduct counsel would not diverge
from the practice of alerting the court and opposing counsel at
the close of the opponent's case of an intent to draw an
inference. The prosecutor's conduct is even more offensive in
this case because her adversary fully adhered to *Clawans* by
requesting leave of court to comment on the non-production of
two of the State's witnesses after the conclusion of the State's
case. The prosecutor immediately objected, and after remind-
ing the court of the two-part standard in *Clawans*, she argued
that the comment should not be allowed. The trial court
refused defense counsel's request to make the inference. We
mention this not because the request was wrongly denied but

because the prosecutor demonstrated her familiarity with *Clawans*, yet failed to adhere to it in her own summation.

Although we find this conduct to be deserving of severe criticism, the fact remains that defense counsel never objected to the prosecutor's statement in summation. We must therefore apply the plain error rule—that is, "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." *State v. Thornton*, 38 *N.J.* 380, 396 (1962) (citations omitted).

We first observe that defense counsel's failure to make an objection at trial creates an inference that he did not find the prosecutor's remarks prejudicial. *State v. Johnson*, 31 *N.J.* 489, 511 (1960). Moreover, an objection would have given the trial court an opportunity to counteract any prejudice caused by the statement. *Ibid.* As it is, we must now resort to hindsight to gauge whether the jury would have reached a different result based solely on the exclusion of the prosecutor's unauthorized inference. We conclude that it would not.

Our reason for this conclusion is that the jury had been informed that Davis was the sole person who could support the defendant's alibi and that Davis was listed on the notice-of-alibi form. Ironically, the source of this information was the defendant himself. The defendant's reliance on Davis as an alibi witness through his testimony created in itself an implied inference that Davis was critical to his defense. The prosecutor's comments on Davis's absence did not cause prejudice beyond that which defendant created by his own words. The defendant exposed the lacuna. The prosecutor merely called greater attention to it.

IV

We next consider whether it was plain error for the trial court to admit Detective Colicelli's alleged hearsay statements concerning the "information" that he received linking the

defendant as a suspect. The testimony in question occurred during the following colloquy with the prosecutor:

Q: When you say you continued looking into your investigation what does that include?

A: I went down the neighborhood, canvassed the neighborhood, basically put the word out of what happened and if anybody had any information to call me at the robbery squad.

Q: Then prior to September 28 did you receive some information?

A: Yes.

Q: Okay. Based on that information what did you do?

A: Based on the information I then followed up on the information I received, obtained from the gallery photo information I received and made a photo array.

Q: Okay. Do you recall how many photos were in the photo array that you made?

A: Six per person.

Q: Okay. Do you recall who was in the photo array?

A: Each photo array, yes, one photo array was including Larry Irving and one photo array included Grady Livingston and Carl Grady Livingston.

Q: How do you determine which photo to put in a photo array?

A: Usually you'll pick the person who is the subject that you received the information or your investigation has pointed to and then choose approximately five to six other photos that closely resemble that person so that the witness or victim can then thumb through and pick one from that.

During her summation, the prosecutor commented on this testimony, emphasizing the value of the information received:

Detective Colicelli told you he had some information. He took the picture of the suspect. * * * Is it a coincidence that they [Frisco and Tutt] picked out the person, the suspect that Colicelli made the line-up about if you follow what I'm saying? It's no coincidence. The reason they picked out Larry Irving was because Larry Irving was the person who committed the robbery.

The defendant's position is that the "inescapable inference" from this testimony and the prosecutor's summation is that an unidentified informer, who was not present and subject to cross-examination, had told Colicelli that Irving had committed the crime. Defendant asserts that under *State v. Bankston*, 63 *N.J.* 263 (1973), this testimony violated the hearsay rule, *Evid. R.* 63, and the defendant's sixth-amendment right to be confronted by the witnesses against him. He urges the Court to view that impropriety as one capable of producing an unjust result. *See R.* 2:10–2.

We agree with defendant that the testimony constituted hearsay under *Bankston*, contrary to the Appellate Division's conclusion. However, we hold that in the context of this case, there was no plain error.

In *Bankston*, we acknowledged the well-settled rule that the rule against hearsay testimony is not violated when a police officer explains the reasons he approached a suspect or went to the scene of a crime by stating that he did so "upon information received." 63 *N.J.* at 268. This type of general testimony, we noted, is admissible to show that the officer was not acting arbitrarily. *Ibid.* Conversely, it is also well established that when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the hearsay rule is violated. *Ibid.* In *Bankston*, we expanded the applicability of the rule by determining that a specific hearsay statement is not required in order to create an impermissible inference of guilt. We held: "When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given police evidence of the accused's fault, the testimony should be disallowed as hearsay." *Id.* at 271.

Setting aside the fact that *Bankston* involved error called to the attention of the trial court rather than plain error, we observe that the testimony given in *Bankston* was closely akin to Detective Colicelli's testimony. In *Bankston*, a detective testified that after receiving information from an informant, he sought a person fitting the informant's description who would have narcotics in his possession. The detective found that person in a bar and apprehended him. The inescapable inference, although never specifically repeated, was that an informant had told the officer that the defendant was committing a crime. In this case Detective Colicelli testified that after going down to the neighborhood and asking for leads, he focused on the defendant as the subject of his investigation and placed his picture in the array. Again, the inescapable inference, although never specifically stated, was that an informant had told

Colicelli that defendant committed the crime. Concededly, in *Bankston*, the officer testified more specifically on the information provided by the informant. However, the Court found that the creation of the inference, not the specificity of the statements made, was the critical factor in determining whether hearsay was violated.

As was the case in *Bankston*, there was no need for any reference to an informer or any allegation that the police acted arbitrarily. 63 *N.J.* at 272. This case is therefore unlike *State v. Long*, 137 *N.J.Super.* 124 (App.Div.1975), where it was held permissible to allow an officer to explain that he went to the scene of the arrest because he was told "people" at the address were selling cocaine. Without this explanation, the officer's conduct would have appeared arbitrary. Here, a simple statement by Colicelli that he developed the photo array "based on information received" would have been sufficient to explain his actions. Even more unnecessary, however, were the prosecutor's statements on summation, which focused on the "coincidence" that the informant's lead proved correct.

The distinguishing factor between this case and *Bankston* is the fact that in *Bankston* the defense counsel made a timely objection to each impropriety, thus preserving the issue for appeal. Here defense counsel did not object to Colicelli's testimony, even though the same testimony had been given at the *Wade* hearing prior to trial. Because the issue is now to be resolved under the "plain error" rule, we must consider whether there is reasonable doubt that the jury would have ruled other than as it did.

Instructive to this inquiry is *State v. Douglas*, 204 *N.J.Super.* 265 (App.Div.1985), which addressed plain error in a similar factual context. In *Douglas*, a defense attorney made an untimely objection to the prosecutor's remarks in summation regarding an officer's testimony explaining why the defendant's picture had been placed in a photo array. Examining the plain error rule in the *Bankston* context, along with *State v.*

*Manning,* 82 *N.J.* 417 (1980), and *State v. Thomas,* 168 *N.J.Super.* 10 (1979), the Appellate Division found that in each case hearsay testimony was prejudicial to the defendant because the State's case was tenuous. The court found, however, that when a case is fortified by substantial credible evidence—for example, direct identification of the defendant—the testimony is not likely to be prejudicial under the "plain error" rule. *Douglas, supra,* 204 *N.J.Super.* at 275.

In this case, two eyewitnesses identified the defendant both in court and out of court. Defendant's time slips indicated that the only day he arrived late to work during a four week period was on the date of the robbery. The only day he missed work during this period was the day before the robbery, the same day that his accomplice, co-defendant Livingston, was seen parked on the street a distance away from Frisco's Luncheonette. Under those circumstances we do not find that a reasonable doubt is raised on whether the hearsay led the jury to a result it otherwise might not have reached.

### V

Finally, defendant raises issues concerning sufficiency of the evidence, the cumulative effect of trial errors, merger, ineffective assistance of counsel, and excessiveness of sentence. None of those points has merit and none requires comment.

Judgment affirmed.

HANDLER, J., dissenting.

I agree with Justice O'Hern that the only justification for the notice of alibi has been converted into a testimonial weapon and der our rules of practice, these relate only to discovery and trial preparation. In the circumstances of this case, however, the notice-of-alibi has been converted into a testimonial weapon and used against the defendant. This enormously strengthens the State's hand against the defendant: the State not only learns of a defense in advance of trial but also extracts testimony for

prosecutorial use at trial. In my opinion, this violates defendant's constitutional and state common-law privilege against self-incrimination.

The determination of whether there has been a violation against the privilege against self-incrimination involves a two-pronged inquiry: (1) whether there was a "testimonial" event, and (2) whether there was "compulsion." Justice O'Hern explains the testimonial character of the notice of alibi in this case, *viz:*

> Like all of the other situations in which a defendant may be forced to give evidence to aid in the preparation of the prosecution's case, the notice-of-alibi requirement can be justified as not violating the State and Federal guarantees against self-incrimination only to the extent that the compelled evidence is non-testimonial. The majority inverts this principle: it treats the use of the notice of alibi as testimonial when its only justification in law is as a non-testimonial event.
>
> [*Post* at 465 (footnote omitted).]

The majority, however, appears to discount the importance of the testimonial aspect of the use of the notice of alibi, stressing that the notice of alibi can survive constitutional scrutiny even if testimonial, as long as it is not "compelled":

> The dissent's [Justice O'Hern's] assertion that the only justification for the notice-of-alibi rule is as a *"non-testimonial* event" ... is ... wide of the mark. The justification for the rule, under *Williams*, is that it does not compel self-incriminating testimony.
>
> [*Ante* at 465.]

Justice O'Hern's dissent demonstrates why the use of the notice is "testimonial." In addition, and contrary to the reasoning of the majority, use of the alibi notice to impeach credibility also constitutes unconstitutional compulsion.

I.

Part of the difficulty in the analysis of this issue inheres in the overlap of the notions of what is testimonial and what is compulsory. In *Fisher v. United States*, 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (1976), the Supreme Court found that not all compulsion is forbidden under the fifth amendment, only that which eventuates in "testimony" or denotes communicative

content. *Id.* at 410–11, 96 *S.Ct.* at 1580–81, 48 *L.Ed.*2d at 55–56. The Court had previously held that the production of handwriting, voice, and blood samples can be compelled because they are not "testimonial" or "communicative." [1] *Fisher,* however, was the first time that the Court explained how what might otherwise be considered only an act of production could also be regarded as a "testimonial" or "communicative" act; *Fisher* held that under some circumstances, an act of production can be testimonial, wholly aside from the contents of the papers produced. *Id.* at 410, 96 *S.Ct.* at 1581, 48 *L.Ed.*2d at 56. This position was clarified in *United States v. Doe,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984), in which the Court held that delivery of documents by the owner of a sole proprietorship was a testimonial act insofar as the act might be used to affirm the truth of the documents' contents or authenticate them as his own. *Id.* at 613, 104 *S.Ct.* at 1242, 79 *L.Ed.*2d at 560–61; *see also Braswell v. United States,* —— *U.S.* ——, ——, 108 *S.Ct.* 2284, 2296, 101 *L.Ed.*2d 98, 115 (1988) (although act of production by corporation's representative is unprotected action of the "corporation," government may make no evidentiary use of the "individual act" of production against the individual). This Court has similarly recognized this analytic framework for determining when acts of production are testimonial in character. *Matter of Grand Jury Proceedings of Guarino,* 104 *N.J.* 218, 226–29 (1986).

We agree that the Supreme Court made clear in *United States v. Doe* that such testimonial use of compelled discovery for the purpose of showing the defendant has affirmed the truth of its contents violates the "testimony" prong of the fifth

---

[1] *See Gilbert v. California,* 388 *U.S.* 263, 265–67, 87 *S.Ct.* 1951, 1952–54, 18 *L.Ed.*2d 1178, 1181–83 (1967) (fifth amendment does not apply to handwriting exemplars); *United States v. Wade,* 388 *U.S.* 218, 222–23, 87 *S.Ct.* 1926, 1929–30, 18 *L.Ed.*2d 1149, 1154–55 (1967) (fifth amendment does not apply to voice samples); *Schmerber v. California,* 384 *U.S.* 757, 763–64, 86 *S.Ct.* 1826, 1831–32, 16 *L.Ed.*2d 908, 915–16 (1966) (no privilege to refuse to give blood samples).

amendment. 465 *U.S.* at 613, 104 *S.Ct.* at 1242, 79 *L.Ed.*2d at 560–61. As Justice O'Hern analyzes the consequences of the present holding,

> [w]hen the defendant prepares and provides the notice of alibi he may be seen as performing two conceptually separate acts. First, he is providing information so that the prosecutor will not be surprised by the presentation. Second, he may be seen as vouching for the truth and completeness of that alibi. Even if we assume (as *Williams* does) that the alibi information required of the defendant is "non-testimonial," he cannot be made to vouch for it.
>
> [*Post* at 466.]

In this case, defendant assuredly has been required to affirm or deny the contents of the notice of alibi. There can be no genuine quarrel that the production of the notice of alibi has been converted to a testimonial use.

## II.

I think it is also clear that in the context of the privilege against self-incrimination, the production of the notice of alibi is "compelled." Our understanding of the nature of "compulsion" in terms of the privilege against self-incrimination is informed by a different strain of authority from that dealing with what is "testimonial." Unconstitutional compulsion can take different forms: "pristine" compulsion involves direct sanctions for refusing to waive the fifth amendment; indirect or conditional compulsion can occur when a "burden" is placed on the otherwise unconditional right to remain silent, such that the decision to waive that right is no longer considered truly "voluntary." See R. Mosteller, "Discovery Against the Defense: Tilting the Adversarial Balance," 74 *Calif.L.Rev.* 1567, 1593 (1986). Examples of pristine compulsion are the police beating someone into talking to them, *Harris v. New York*, 401 *U.S.* 222, 224, 91 *S.Ct.* 643, 645, 28 *L.Ed.*2d 1, 4 (1971) (statements made to police that do not satisfy legal standards of trustworthiness not admissible); threats of charges of contempt for declining to testify before a grand jury without waiving the privilege, *State v. Portash*, 440 *U.S.* 450, 99 *S.Ct.* 1292, 59 *L.Ed.*2d 501 (1979); and adverse inferences drawn from

silence at trial, *Griffin v. California*, 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (1965).

The second form of unconstitutional compulsion involves the state's conditioning the preservation of other constitutional rights on a waiver of the privilege as a result of which the choice to waive is no longer considered truly voluntary. For example, in *Simmons v. United States*, 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247 (1968), the Court held that protection of fourth amendment rights could not be conditioned on waiver of the fifth. The Court determined that testimony given by a defendant to meet standing requirements necessary to raise a fourth amendment challenge would not be admissible against defendant at trial. The Court rejected the argument that the testimony was voluntarily given; it found instead that the defendant waived the privilege against self-incrimination only in order to protect his fourth amendment rights. 390 *U.S.* at 393–94, 88 *S.Ct.* at 976, 19 *L.Ed.*2d at 1258–59. "[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.* at 394, 88 *S.Ct.* at 976, 19 *L.Ed.*2d at 1259. In *Lefkowitz v. Cunningham*, 431 *U.S.* 801, 97 *S.Ct.* 2132, 53 *L.Ed.*2d 1 (1977), the Court again found that compelled choices between constitutional rights are impermissible. In that case, the Court struck down a New York statute that permitted deprivation of political office for persons who refuse to waive the fifth amendment for grand jury hearings. The Court found that the exercise of first amendment freedoms of political association could not be conditioned on waiver of the fifth amendment privilege. In *Brooks v. Tennessee*, 406 *U.S.* 605, 92 *S.Ct.* 1891, 32 *L.Ed.*2d 358 (1972), the Court struck down a Tennessee statute that required a defendant who wished to waive the privilege against self-incrimination to do so before the prosecutor presented the State's case or lose the right to do so later. *Brooks* found the defendant has a constitutional right to present his or her defense after the State bears its burden of proof. This right, which fixes the burden of proof on the State,

could not be waived in order to preserve the fifth amendment right to waive the privilege. The Court struck down this rule for impermissibly "cast[ing] a heavy burden on a defendant's otherwise unconditional right not to take the stand." *Id.* at 610, 92 *S.Ct.* at 1894, 32 *L.Ed.*2d at 363.

In the present case, under the majority's reasoning, the defendant is similarly confronted with a constitutional Hobson's choice: the defendant's right to remain silent must be waived in order to preserve the right to assert an alibi defense. If defendant wishes to testify without concern that the notice of alibi will be used against him, then he must abandon his alibi defense; conversely, if he chooses to press his alibi defense, he must relinquish the right to testify without apprehension that the notice of alibi will be used against him. Under the majority's rule, therefore, a defendant who wishes to present an alibi defense is confronted by a substantial burden on his otherwise unconditional right not to impeach himself. *See id.* Here, the use of the notice of alibi to impeach credibility is a testimonial use; defendant's waiver of the fifth amendment privilege is conditionally compelled in that his right to an alibi defense is conditioned on a required testimonial use of the notice. Therefore, exercise of the right to an alibi defense is substantially burdened by the fact that the defendant must give up the fifth amendment privilege in order to assert the alibi defense.

A critical review of *Williams v. Florida,* 399 *U.S.* 78, 90 *S.Ct.* 1893, 26 *L.Ed.*2d 446 (1970), as it bears on the question of indirect or conditional compulsion, will disclose that the majority has misperceived and misapplied its teaching. *Williams* found that as used in that case, the notice-of-alibi requirement involved neither testimony nor compulsion. First, *Williams* found that there was no testimonial event involved in filing the alibi notice: (1) no statements would be used at trial (399 *U.S.* at 82, 90 *S.Ct.* at 1896, 26 *L.Ed.*2d at 450); and (2) defendant would not be compelled to follow through with the alibi defense at trial in order to avoid an unfavorable inference. *Id.* at 84, 90

*S.Ct.* at 1897, 26 *L.Ed.*2d at 451. In short, the Court anticipated no litigational use would be made of the notice. Moreover, it cannot be overemphasized that *Williams* antedated the first articulation of the communicative/testimonial implications of the production of evidence as expressed by *Fisher* and *Doe.* The *Williams* Court thus did not consider whether any "communicative" use of the contents of the notice, such as an affirmation of the truth of its contents, was permissible.

Instead, the *Williams* majority and dissent differed only over whether the providing of names to the prosecutor involves the fifth amendment, if *no* judicial use is made of the contents unless the defendant decides to present an alibi defense. The majority rejected the dissent's position that the adverse effect of providing names in advance of trial, before a defendant determines to use an alibi, violates the fifth amendment. The majority reasoned that since a defendant in presenting an alibi can be forced to give names during trial without implicating the fifth amendment, being forced to give names before trial would similarly not implicate the fifth amendment. *Id.* at 83–84, 90 *S.Ct.* at 1897, 26 *L.Ed.*2d at 451.

Second, *Williams* held there was no compulsion insofar as it found no burden on defendant's choice to waive the privilege at trial. According to the majority, whether the defendant ultimately chose to take the stand was still left to his "unfettered choice." *Id.* at 84, 90 *S.Ct.* at 1897, 26 *L.Ed.*2d at 451. Under the majority's understanding, filing the notice was in no way related to the decision to take the stand. Thus, the Court did not focus on the testimonial potential of either the *filing* of the notice or the possible use of its *contents* in determining that the privilege against self-incrimination was not implicated. It is in this context that we must read the following observation:

> The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction.... The pressures generated by the State's evidence may be severe but they do not vitiate the defendant's choice to present an alibi defense and witnesses to prove it, even though the attempted defense ends in catastrophe for the defendant. However "testimonial" or "incriminating" the alibi defense proves to be, it

cannot be considered "compelled" within the meaning of the Fifth and Fourteenth Amendments.

·[*Ibid.*]

To reiterate, the majority in *Williams* rejected the argument that the alibi-notice requirement violated the fifth amendment because: (1) it found the notice itself non-testimonial because its contents would not be used at trial and there was no intimation that the mere filing or production of the notice had any potential testimonial uses; and (2) absent any testimonial use of the notice itself, it found no compelled waiver because the voluntary preparation of the notice would have no impact on the otherwise voluntary decision to take the stand.

In the present case, the majority relies on *Williams* to make the additional argument that there is no compulsion in using the notice to impeach credibility since the notice was itself voluntarily prepared:

The decision whether to file the notice, according to the Court in *Williams*, was no different from a defendant's decision to testify or to remain silent—a dilemma that has "never been thought an invasion of the privilege against compelled self-incrimination." *Williams, supra,* 399 *U.S.* at 84–85, 90 *S.Ct.* at 1897–98, 26 *L.Ed.*2d at 451.

[*Ante* at 434.]

However, the Court overreads or misreads *Williams*. The Court in this case is adding a condition subsequent to the filing of the notice of alibi that the Supreme Court in *Williams* did not: the subsequent testimonial use of the notice. The defendant's decision in *Williams* to file the notice and take the stand were two separable voluntary acts. Indeed, the *Williams* majority found no added risks of incrimination arising from the notice itself. 399 *U.S.* at 85, 90 *S.Ct.* at 1898, 26 *L.Ed.*2d at 452. It is in this context that we must read the following passage on "compulsion" from *Williams*, which is quoted by the majority:

Nothing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice. That choice must be made, but the pressures that bear on his pretrial decision are of the same nature as those that would induce him to call alibi witnesses at the trial: the historical fact beyond both his and the State's control

and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not *compelled* self-incrimination transgressing the Fifth and Fourteenth Amendments. *Id.* at 84-85, 90 *S.Ct.* at 1897-98, 26 *L.Ed.*2d at 451-52.

[*Ante* at 434.]

In our case, filing the notice subject to its later use for impeachment purposes combines what in *Williams*. otherwise constituted the separate acts of filing the notice and subsequently taking the stand. Because we now say that a notice may be used for testimonial purposes at trial, we cannot in the next breath assert that the decision to file the notice is truly a separable act; it is now encumbered by adverse testimonial consequences. And, conversely, we cannot claim that the decision to testify itself can be exercised freely; it is now burdened by the antecedent notice.

The critical question in the present case is whether it is constitutionally permissible to condition the right to an alibi defense on a waiver of the fifth amendment. As stated earlier, I believe that use of the alibi notice to impeach credibility is a testimonial use. I also believe that conditioning preservation of an alibi defense on a testimonial use is tantamount to conditioning the alibi defense on a waiver of the fifth amendment as well as our common-law privilege against self-incrimination. Such a condition for exercising a constitutional right to a defense "casts a heavy burden on a defendant's otherwise unconditional right not to take the stand." *Brooks v. Tennessee, supra,* 406 *U.S.* at 610, 92 *S.Ct.* at 1894, 32 *L.Ed.*2d at 363.

The notion that the defendant has "voluntarily" prepared the alibi notice should not collapse into a conclusion that the waiver of the privilege against self-incrimination is itself voluntary. The right to an alibi defense and the right to remain silent are two separate constitutional rights. Exercise of one should not be conditioned on waiver of the other. Just as in *Simmons v. United States, supra,* 390 *U.S.* at 377, 88 *S.Ct.* at 967, 19 *L.Ed.*2d at 1247, where exercise of the fourth amendment cannot be conditioned on waiver of the fifth; *Lefkowitz v.*

*Cunningham, supra,* 431 *U.S.* at 801, 97 *S.Ct.* at 2132, 53 *L.Ed.*2d at 1, where the first amendment right to hold political office cannot be conditioned on waiver of the fifth; and *Brooks v. Tennessee, supra,* 406 *U.S.* at 605, 92 *S.Ct.* at 1891, 32 *L.Ed.*2d at 358, where waiver of the privilege cannot be conditioned on giving up the right to have the prosecutor bear the burden of proof first, we should not allow such a choice between constitutional rights.

### III.

I join in Justice O'Hern's opinion that use of the notice for the limited purpose of expediting discovery is a legitimate purpose already narrowly served by the litigational penalties. *Post* at 465.[2] Any testimonial use, however, should be impermissible. In fact, testimonial use, even if only for credibility and not for substantive purposes, transforms the purpose of the notice-of-alibi rule into a device or mechanism for impeaching the credibility of the defendant. *Fisher* and *Doe* make clear that discovery rules should not be transformed into means for obtaining self-incriminating testimony.

Testimony obtained without a voluntary waiver can never be used in court, even for the limited purpose of impeaching credibility. Both federal and state law require an extremely protective remedy for evidence obtained in violation of the privilege against self-incrimination: the defendant shall be put back in substantially the same position as if the privilege had never been violated. *See Kastigar v. United States,* 406 *U.S.* 441, 462, 92 *S.Ct.* 1653, 1666, 32 *L.Ed.*2d 212, 227 (1972); *State v. Strong,* 110 *N.J.* 583, 595 (1988). This means no direct or derivative use can be made of the testimony. *Kastigar v.*

---

[2]*Rule* 3:11-2 states:

If such bill of particulars is not furnished as required, the court may refuse to allow the party in default to present witnesses at trial as to defendant's absence from or presence at the scene of the alleged offense, or make such other order or grant such adjournment as the interests of justice requires.

*United States, supra,* 406 *U.S.* at 453, 92 *S.Ct.* at 1661, 32 *L.Ed.*2d at 221. Indeed, no use for credibility purposes is allowed. *State v. Portash, supra,* 440 *U.S.* 450, 99 *S.Ct.* 1292, 59 *L.Ed.*2d 501.

This highly protective remedy distinguishes fifth amendment from fourth amendment and Miranda-fifth amendment protections directed against police misconduct. *State v. Strong, supra,* 110 *N.J.* at 593. Fourth amendment and *Miranda* doctrine hold that absent coercion, evidence obtained by the police in violation of *Miranda* may be used for credibility purposes, even if it cannot be used for substantive purposes. The majority cites this doctrine to justify limited use of the notice for credibility purposes:

> In *State v. Miller,* 67 *N.J.* 229 (1975), this Court held that a statement taken without full *Miranda* warnings, *see Miranda v. Arizona,* 384 *U.S.* 436 [86 *S.Ct.* 1602], 16 *L.Ed.*2d 694 (1966), although not admissible on the State's case-in-chief, may be used to impeach defendant's credibility as a witness "should the defendant take the witness stand and give testimony which is at variance with what was said in the statement to the police." *Id.* [67 *N.J.*] at 233 (*citing Harris v. New York,* 401 *U.S.* 222 [91 *S.Ct.* 643], 28 *L.Ed.*2d 1 (1972)). We see in *Miller* an analogy to this case, where the only purpose for the use of the notice of alibi was to impeach Irving's credibility.
>
> [*Ante* at 436.]

However, these fourth amendment and *Miranda* doctrines are inapposite. The fourth amendment and *Miranda* remedies are directed toward deterrence of police misconduct, and both the United States Supreme Court and our Court have decided that prohibiting only substantive use of testimony is sufficient for this purpose. *See State v. Strong, supra,* 110 *N.J.* at 593. The fifth amendment privilege against self-incrimination itself, however, is directed against any form of compelled self-incrimination. It therefore protects against not only a substantive testimonial use based on pristine or direct compulsion but any kind of judicial or trial pressures on defendants to waive the privilege in any respect. *See Griffin v. California, supra,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (no adverse inferences may be drawn from silence); *State v. Strong, supra,* 110 *N.J.* at 593–94 (there can be no prosecutorial disadvantages to defendant from failure to waive the privilege). The fifth

amendment remedy that surrounds the privilege precludes any use of compelled testimony; it is directed against self-incrimination; its singular concern is not toward deterrence of future harm. That is why, even in the context of fourth amendment and *Miranda* remedies, if "compulsion" goes to the heart of the privilege itself, and thereby compromises the "truthfulness" of the testimony, such testimony cannot be used even for credibility purposes. *See e.g., State v. Hartley, supra,* 103 *N.J.* 252 (if a defendant's invocation of the right to remain silent is not "scrupulously honored," there is "compulsion as a matter of law"); *State v. Miller,* 67 *N.J.* 229 (1975) (if incriminating evidence is obtained by police through "psychological" coercion, it may be barred). Therefore, because the privilege cannot be impaired by any form of compulsion, the defendant who is thus victimized is entitled to a strict remedy that requires that the defendant be restored substantially to the same position as if no waiver or impairment of the privilege had occurred. *See Kastigar v. United States, supra,* 406 *U.S.* at 462, 92 *S.Ct.* at 1666, 32 *L.Ed.*2d at 227; *State v. Strong, supra,* 110 *N.J.* at 595.

Under the majority's rule, conditioning an alibi defense on a waiver of the fifth amendment and the common-law privilege against self-incrimination, even if waiving only to the extent that the notice is used for credibility purposes, is tantamount to a compulsory waiver. Its limited use for credibility purposes cannot be justified by reliance on fourth amendment protections and *Miranda* doctrine.

I would for these reasons and those presented by Justice O'HERN reverse the judgment of conviction.

O'HERN, J., dissenting.

Trial by jury is a central value of a free society. Like the related privilege against self-incrimination, it "is an ever-present reminder of our belief in the importance of the individual, a symbol of our highest aspirations. As such, it is a clear

and eloquent expression of our basic opposition to collectivism, to the unlimited power of the state." E. Griswold, *The Fifth Amendment Today* 81 (1955). There is a subtle but gradual depreciation of the values of the criminal jury trial in allowing unqualified cross-examination of the defendant about discovery responses contained in his Notice of Alibi.

## I.

To begin with, the practice of discovery against the defense runs against the grain of our law. No one should need to establish innocence in an American courtroom. We allow discovery from the defense in criminal cases only to prevent defendants from making a joke of the system. Such conduct would demean the system of trial by jury. Our criminal law has "consistently been animated by the view that 'ours is an accusatorial and not an inquisitorial system.'" *Miller v. Fenton*, 474 *U.S.* 104, 110, 106 *S.Ct.* 445, 450, 88 *L.Ed.*2d 405, 410 (1985) (quoting *Rogers v. Richmond*, 365 *U.S.* 534, 541, 81 *S.Ct.* 735, 739, 5 *L.Ed.*2d 760, 766 (1961)). "Under our system society· carries the burden of proving its charge against the accused not out of his own mouth." *Watts v. Indiana*, 338 *U.S.* 49, 54, 69 *S.Ct.* 1347, 1350, 93 *L.Ed.* 1801, 1806 (1949). Any diminution of that system may be justified only by the most compelling of needs and must never become the ordinary course of business.

Limits on the power of the state are what distinguish our society from all others. Shortly after returning from Nuremberg, Justice Jackson observed that these guarantees are "a real peril to solution of the crime" and thus present "a real dilemma in a free society" because "the defendant is shielded by such safeguards as no system of law except the Anglo–American concedes to him." *Moran v. Burbine*, 475 *U.S.* 412, 436 n. 5, 106 *S.Ct.* 1135, 1149 n. 5, 89 *L.Ed.*2d 410, 431 n. 5 (1986) (Stevens, J., dissenting) (quoting *Watts v. Indiana, supra*, 338 *U.S.* at 59, 69 *S.Ct.* at 1358, 93 *L.Ed.* at 1808–1809 (Jackson, J., concurring in result).

In *Williams v. Florida,* 399 *U.S.* 78, 90 *S.Ct.* 1893, 26 *L.Ed.*2d 446 (1970) (sustaining notice-of-alibi requirement), Justice Black warned of courts substituting their notions of "what is best" for the "traditional safeguards afforded persons accused of crimes."

> Occasionally this test emerges in disguise as an intellectually satisfying "distinction" or "analogy" designed to cover up a decision based on the wisdom of a proposed procedure rather than its conformity with the commands of the Constitution. Such a course, in my view, is involved in this case. This decision is one more step away from the written Constitution and a radical departure from the system of criminal justice that has prevailed in this country. Compelling a defendant in a criminal case to be a witness against himself in any way, including the use of the system of pretrial discovery approved today, was unknown in English law, except for the unlamented proceedings in the Star Chamber courts—the type of proceedings the Fifth Amendment was designed to prevent.
>
> [*Id.* at 115, 90 *S.Ct.* at 1913, 26 *L.Ed.*2d at 485 (Black, J., concurring in part and dissenting in part).]

Of course, there is no Star Chamber here, only lawyers reviewing papers. Still, our history and tradition, Justice Black warned, counsel against any procedure that would "compel a criminal defendant to assist in his own conviction." *Id.* at 116, 90 *S.Ct.* at 1914, 26 *L.Ed.*2d at 485 (Black, J., concurring in part and dissenting in part).

The majority finds that cross-examination of the defendant about his discovery responses is necessary to "determine where the truth lies." *Ante* at 438. The analysis evokes William Howard Taft's view that

> [w]hen examined as an original proposition, the prohibition that the defendant in a criminal case shall not be compelled to testify seems, in some aspects, to be of doubtful utility. If the administration of criminal law is for the purpose of convicting those who are guilty of crime, then it seems natural to follow in such a process the methods that obtain in ordinary life.
>
> [Taft, "The Administration of Criminal Law," 15 *Yale L.J.* 1, 8 (1905).]

But this misses the entire point—the methods available in ordinary life simply are not available in an American criminal

jury trial. Whatever the merits of discovery on the civil side,[1] discovery from the defense has but a limited role in a criminal jury trial.

Of course, I agree that criminal defendants are to be subject to strict cross-examination regarding what they have freely said in the course of a crime or its investigation. Those statements are clearly part of the real events to be tested at trial. It is, however, another thing to compel a defendant to create a paper trail in order to confront him. This is no measure of criminality. "The law will not suffer a prisoner to be made the deluded instrument of his own conviction." 2 Hawkins, *Pleas of the Crown* c. 46, § 34 (8th ed. 1824), *quoted in Watts, supra,* 338 *U.S.* at 54, 69 *S.Ct.* at 1350, 93 *L.Ed.* at 1806.

## A.

Notice-of-alibi provisions have been sustained only to prevent trials from becoming "a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Florida, supra,* 399 *U.S.* at 82, 90 *S.Ct.* at 1896, 26 *L.Ed.*2d at 450 (footnote omitted). Justice Black even then foresaw:

> On the surface this case involves only a notice-of-alibi provision, but in effect the decision opens the way for a profound change in one of the most important traditional safeguards of a criminal defendant. The rationale of today's decision is in no way limited to alibi defenses, or any other type or classification of evidence. The theory advanced goes at least so far as to permit the State to obtain under threat of sanction complete disclosure by the defendant in advance of trial of all evidence, testimony, and tactics he plans to use at that trial.
>
> [*Id.* at 114, 90 *S.Ct.* at 1913, 26 *L.Ed.*2d at 484 (Black, J., concurring in part and dissenting in part).]

---

[1]Today, the exchange of paper before trial has become somewhat of an end in itself. We are told of litigators who never enter a courtroom. Abuses of the discovery process have been the subject of recent concern. Final Report of the Committee on the Pretrial Phase of Civil Cases, 115 *F.R.D.* 454 (1987); Warren E. Burger, *Abuses of Discovery: Judges are Correcting the Problem,* 20 Trial 18 (1984).

Rule 3:11–1 serves not as a form of examination before trial, but simply "to avoid surprise at trial by the sudden introduction of a factual claim which cannot be investigated unless the trial is recessed to that end." *State v. Garvin*, 44 *N.J.* 268, 272–73 (1965) (Weintraub, C.J.), *quoted in State v. Gross*, 216 *N.J.Super.* 92, 95 (App.Div.), *certif. den.*, 108 *N.J.* 194 (1987). In *Gross* the Appellate Division disapproved of the introduction of the alibi notice to support the inference that a named witness did not appear to avoid perjuring herself. "Such a use of the alibi notice takes it far beyond its narrow purpose to allow the State to meet an alibi which the defendant presents at trial." *Id.* at 96; *see State v. Angeleri*, 51 *N.J.* 382, 384 *cert. denied*, 393 *U.S.* 951, 89 *S.Ct.* 372, 21 *L.Ed.*2d 362 (1968) ("Our rule of Court is not designed to compel a defendant to say anything."). In emphasizing the use of the alibi notice to test credibility, the majority exceeds this limited justification of avoiding an "eleventh-hour defense." *Williams v. Florida, supra*, 399 *U.S.* at 81, 90 *S.Ct.* at 1896, 26 *L.Ed.*2d at 450.

Contrary to the majority's interpretation, *see ante* at 434–438, *Williams* does not stand for the general proposition that a notice-of-alibi rule does not compel the defendant to provide information. First, such a proposition was simply not before that court. As Justice Handler points out in his dissenting opinion, *see ante* at 448, the court was well aware that the notice in that case was not to be introduced at trial and its language or contents had no effect on the defendant's decision to present his alibi. All that the defendant complained about was that the State had a chance to investigate his alibi, not that it would cross-examine him about how he had prepared the notice. In fact, both *Williams* and *Angeleri* explicitly relied on the fact that the alibi notice was used only for investigative purposes. *Williams, supra*, 399 *U.S.* at 82–83, 90 *S.Ct.* at 1896–97, 26 *L.Ed.*2d at 450 ("No pretrial statement of petitioner was introduced at trial; but armed with [the witness'] name and address and the knowledge that she was to be petitioner's alibi witness, the State was able to take her deposition in advance of

trial and to find rebuttal testimony."); *Angeleri, supra,* 51 *N.J.* at 385 ("There is no suggestion that the State sought the pre-trial disclosure for any other reason [than to avoid surprise at trial] or put it to any other use."). Moreover, the Supreme Court in *Williams* pointed out that no evidence was gained that would not have been available through other, albeit more disruptive and inconvenient, means:

> Petitioner concedes that absent the notice-of-alibi rule the Constitution would raise no bar to the court's granting the State a continuance at trial on the ground of surprise as soon as the alibi witness is called. *Nor would there be self-incrimination problems if, during that continuance, the State was permitted to do precisely what it did here prior to trial: take the deposition of the witness and find rebuttal evidence.* But if so utilizing a continuance is permissible under the Fifth and Fourteenth Amendments, then surely the same result may be accomplished through pretrial discovery, as it was here, avoiding the necessity of a disrupted trial.
>
> [399 *U.S.* at 85–86, 90 *S.Ct.* at 1898, 26 *L.Ed.*2d at 452 (emphasis added) (footnotes omitted).]

Similar logic was employed in *Angeleri, supra,* 51 *N.J.* at 385 ("In calling upon a defendant to reveal a claim of that kind before trial, our rule is designed 'to avoid suprise at trial by the sudden introduction of a factual claim *which cannot be investigated unless the trial is recessed to that end.*' ") (quoting *State v. Baldwin,* 47 *N.J.* 379, 388, *cert. denied,* 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966) (quoting *State v. Garvin, supra,* 44 *N.J.* at 272–273)) (emphasis added). By contrast, the majority holding allows use of the notice of alibi as a pretrial deposition of the defendant, a form of evidence heretofore unavailable by any means.

Second, to suggest that the notice-of-alibi rule does not in any way "compel" the defendant to give evidence strikes me as, at best, less than realistic. Surely a rule that forces the defendant in advance of trial to reveal his alibi at the risk of losing his constitutional right to present witnesses in his defense [2]

---

[2]While the United States Supreme Court has upheld the preclusion of defense witness testimony as a sanction for defense counsel's discovery violations, *Taylor v. Illinois,* 484 *U.S.* 400, 108 *S.Ct.* 646, 98 *L.Ed.*2d 798 (1988), our Court

must be seen as compelling information. *See supra* at 440–441. While such a procedure might be acceptable under the narrow circumstances of *Williams* and *Angeleri,* where no additional prosecutorial advantage was gained (it was merely used to avoid trial delay), it is unacceptable if used against the defendant at trial.

## B.

Like all of the other situations in which a defendant may be forced to give evidence to aid in the preparation of the prosecution's case,[3] the notice-of-alibi requirement can be justified as not violating the State and federal guarantees against self-incrimination only to the extent that the compelled evidence is non-testimonial.[4] The majority inverts this principle: it treats

has not yet had occasion to decide whether such a harsh procedure would violate our State Constitution. *See id.* at ——, 108 *S.Ct.* at 657, 98 *L.Ed.*2d at 817 (Brennan, J., dissenting) ("[A]t least where a criminal defendant is not personally responsible for the discovery violation, alternative sanctions are not only adequate to correct and deter discovery violations but are far superior to the arbitrary and disproportionate penalty imposed by the preclusion sanction.").

[3]*Gilbert v. California,* 388 *U.S.* 263, 87 *S.Ct.* 1951, 18 *L.Ed.*2d 1178 (1967) (handwriting exemplars); *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967) (voice exemplars); *Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966) (blood samples).

[4]*Braswell v. United States,* —— *U.S.* ——, 108 *S.Ct.* 2284, 101 *L.Ed.*2d 98 (1988) (act of production of corporate documents is "testimonial" and thus may not be used against the defendant custodian of corporate records in his individual capacity); *United States v. Doe,* 465 *U.S.* 605, 613, 104 *S.Ct.* 1237, 1242, 79 *L.Ed.*2d 552, 560 (1984) (although business records themselves are not protected, "the act of producing the documents would involve testimonial self-incrimination."); *see also Fisher v. United States,* 425 *U.S.* 391, 410, 96 *S.Ct.* 1569, 1581, 48 *L.Ed.*2d 39, 56 (1976) ("The act of producing evidence * * * has communicative aspects of its own, wholly aside from the contents of the papers produced."); *In re Guarino,* 104 *N.J.* 218 (1986) (production of business records did not violate self-incrimination privilege where defendant granted use immunity for producing the documents).

the use of the notice of alibi as *testimonial* when its only justification in law is as a *non-testimonial* event.

When the defendant prepares and provides the notice of alibi, he may be seen as performing two conceptually separate acts. First, he is providing information so that the prosecutor will not be surprised by the presentation. Second, he may be seen as vouching for the truth and completeness of that alibi. Even if we assume (as *Williams* does) that the alibi information required of the defendant is "non-testimonial," he cannot be made to vouch for it. The Court, however, justifies the use of the alibi notice to impeach credibility by the fact that the notice-of-alibi was testimonial in nature: "[t]he *testimonial* nature of the notice of alibi is clear from the defendant's signature on the document." *Ante* at 437 (emphasis added). In fact, in order to use the compelled evidence, the prosecution bears the burden of demonstrating that the evidence it is using is *not testimonial. Doe, supra; Braswell, supra.*

Furthermore, when we are concerned with information that is judicially compelled, as opposed to information obtained through police misconduct, "the protection against self-incrimination * * * is heightened." *State v. Strong,* 110 *N.J.* 583, 594 (1988). Permitting use of the notice itself to impeach credibility goes far beyond the narrow purpose for which Rule 3:11–1 was promulgated and approved. The use of the act of presenting the notice to "authenticate or vouch for the accuracy," *Braswell, supra,* —— *U.S.* at —— n. 3, 108 *S.Ct.* at 2288 n. 3, 101 *L.Ed.*2d at 105 n. 3, of the information contained therein, violates the principles of *Fisher, Braswell, Doe,* and *Guarino.* The majority's logic, focusing as it does solely on the truth-finding function and subsuming the self-incrimination problems, would also allow the deposing in pretrial of all defendants who plan to present a defense in order to allow the prosecution to prepare against surprises and to improve the truth-finding process. Both are admirable goals, but neither can violate the defendant's right against self-incrimination.

## II.

I am sure that the majority has no agenda to weaken fundamental privileges.

Instead, [as elsewhere] these privileges have been weakened due to the courts' concern with enhancing the truth-seeking process and fear that these privileges may provide a shield for perjury by the defendant. * * *

The process of erosion has been incremental. Courts have examined each new intrusion into the defendant's privileges independently, almost in isolation, and have approved each in part because it had but a limited impact upon the total range of protections available to the defendant. The cumulative effect, however, has been profound. Through a series of small steps, each arguably justified, the traditional balance between the prosecution and the defense has been fundamentally altered.

[Mosteller, *Discovery Against the Defense: Tilting the Adversarial Balance*, 74 *Cal.L.Rev.* 1567, 1571–72 (1986) (footnote omitted).]

I suspect that the way criminal discovery is furnished is vastly different from the way that a civil anti-trust defense is prepared. Many defendants are jailed before trial with but limited access to the dwindling resources of the Public Defender's office. We ought not to impose greater burdens on their ability to defend than is required to counter eleventh-hour defenses.

In this case, there was a particular pettiness to the use of the discovery papers. The typically-rushed defense counsel had to file the first alibi notice without investigation because a court had ordered it filed under penalty of forfeiting the alibi defense. The incarcerated defendant had no chance to speak with his alibi witnesses. Whatever relevance to credibility an initial failure to list a potential witness may have under other circumstances, surely there is little probative value to such an inference under the facts of this case.

Real trials should never become a test of the defendant's paper processing. There is enough paperwork now that we need not escalate its importance beyond its rudimentary purpose of avoiding surprise alibis. Quite aside from the trivialization of the jury trial, there is at play here a subtle shift in our ideals. We diminish the presumption of innocence when we

infer that one who under compulsion poorly details his innocence becomes suspect.

If I believed that there was any evidence in the case that the defendant deliberately manipulated the discovery process to achieve a tactical advantage over the State, I might conclude otherwise. I see no suggestion of that in this case—only the clumsy attempts of a confined individual to cope with the procedural processes of a litigation system that he little understands.

Although it is perhaps the "mildest and least repulsive form" [5] of depreciation of the right to trial by accusation and not inquisition, I would not routinely permit cross-examination of a criminal defendant about deficiencies and inconsistencies in his coerced discovery materials. While I would afford the State opportunity to counter surprise, I see none here. If there were such a "wilful violation" of a discovery rule to gain a tactical advantage, that would be the time "for the prosecutor to inform the jury about the circumstances casting doubt on the testimony." *Taylor v. Illinois*, 484 *U.S.* 400, ——, 108 *S.Ct.* 646, 663, 98 *L.Ed.*2d 798, 824 (1988) (Brennan, J., dissenting). A court should inquire in a Rule 8 hearing whether such were the case but should not unqualifiedly allow cross-examination about criminal discovery responses without knowing the reasons for any discrepancy and whether the inconsistencies were planned to gain a tactical advantage over the State.

---

[5]The warning of *Boyd v. United States*, 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746 (1886), has proven particularly prescient in the area of discovery against the defense:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. * * * A close and literal construction deprives [constitutional provisions for the security of persons and property] of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.
>
> [Mosteller, *supra*, 74 *Cal.L.Rev.* at 1572 n. 10 (quoting *Boyd v. United States, supra*, 116 *U.S.* at 635, 6 *S.Ct.* at 535, 29 *L.Ed.* at 752).]

I join in the other aspects of the Court's opinion but, for the reasons stated, I would reverse the judgment of conviction and remand for a new trial.

Justice HANDLER joins in this opinion.

*For affirmance* —Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, GARIBALDI, and STEIN—5.

*For reversal* —Justices HANDLER and O'HERN—2.