SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Jose Medina** (A-67-18) (081926)

**Argued March 16, 2020 – Decided June 9, 2020**

**Timpone, J., writing for the Court.**

In this appeal, the Court considers whether, under the circumstances of this case, a detective's testimony that he had included defendant Jose Medina's picture in a photo array based on the "evidence . . . collected" violated the hearsay rule or defendant's constitutional right to confront the witnesses against him.

In December 2013, Anthony Rivera was slashed across the face as he exited a bar. Police spoke with Rivera, who described his attacker and indicated that he could identify the attacker if he saw him again. His friend Tommy Rafferty also described, but could not identify, the attacker. Officers spoke with a woman at the scene who wished to remain anonymous. She identified the attacker as defendant and showed the police one of defendant's Instagram pictures and his username. Detective Anthony Abate prepared a photo array that included defendant's picture. Looking at the array, Rivera identified defendant as the attacker.

Rivera also identified defendant as his attacker at trial. Abate also testified and confirmed, over defendant's objection, that officers at the scene "spoke with one female who didn't want to get involved." Abate further confirmed Rafferty "was the only one who was willing to come in and give a statement." Abate testified he obtained surveillance footage, which the State played for the jury. Abate told the jury that Rivera provided a description of the attacker and said that he could identify the attacker if he saw him again. At that point, the prosecutor asked, "based on . . . the evidence that you collected, did you have a suspect?" Abate stated that defendant was the suspect.

Abate further testified that he generated a photo array. The prosecutor asked whether Abate was "going based in any way on [his] viewing of the surveillance footage" when he made the array; Abate replied affirmatively. On redirect, Abate confirmed that the responding officers at the scene "managed to speak with one person, a female, who wished to remain anonymous, didn't want to give a statement." He explained that the officers attempted to question other people at the scene, but that "nobody else . . . volunteered to give any statements."

1

The jury convicted defendant of aggravated assault and weapons offenses, and defendant appealed. The Appellate Division reversed and remanded for a new trial. The appellate court found it problematic that the investigating officer relied on unverifiable hearsay statements to create a photo array and also took issue with Abate's testimony. The Court granted the State's petition for certification. 237 N.J. 419 (2019).

**HELD:** Viewing the trial record in its entirety, the detective's testimony, in context, did not compel the inference that he had superior knowledge incriminating defendant from a non-testifying witness. The testimony therefore did not violate defendant's confrontation right or the hearsay rule. Although there was no abuse of discretion in the admission of the testimony here, the Court cautions against using the phrase "based on the evidence collected" in this context and provides guidance as to curative instructions.

1. In State v. Bankston, the Court noted that the use of neutral explanatory phrases, such as the officer approached a suspect "upon information received," are admissible to show "the officer was not acting in an arbitrary manner." 63 N.J. 263, 268 (1973). The Court stressed, however, that when the officer repeats "what some other person told him concerning a crime by the accused," the testimony violates both the hearsay rule and the defendant's confrontation right. Id. at 268-69. And even where the officer does not reiterate what he learned from a third party, "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 271. In Bankston, although the detective never repeated what he learned from the informer, the "inescapable inference" from his testimony was that the "unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime." Ibid.; accord State v. Irving, 114 N.J. 427 (1989). The Court held that the testimony should not have been admitted. Bankston, 63 N.J. at 271, 273. Hearsay may not be used to imply that a testifying officer possesses superior knowledge than what is presented to the jury and, hence, his testimony is worthy of greater weight. (pp. 20-25)

2. Here, it is undisputed that Abate never repeated to the jury what the anonymous woman said, so his testimony would only conflict with the above principles if his references to her created an "inescapable inference" that she incriminated defendant. Yet, Abate did not imply that the woman gave police any information at all. Based on the record, the jury likely considered the anonymous woman to be a "dead-end witness." Abate's testimony did not create the "inescapable inference" that he had superior information about defendant's guilt from the anonymous woman, and it did not violate defendant's confrontation right or the hearsay rule under Bankston. (pp. 25-27)

3. In State v. Branch, the Court considered the use of neutral phrases in the particular context of photographic identifications and "disapprove[d] of a police officer testifying that he placed a defendant's picture in a photographic array 'upon information received,'"

2

noting that such "language, by inference, has the capacity to sweep in inadmissible hearsay" by implying the "officer has information suggestive of the defendant's guilt from some unknown source." 182 N.J. 338, 352 (2005). Accordingly, the Court limited the use of "based on information received" to "contexts other than a photographic identification," and "only if necessary to rebut a suggestion that [the officer] acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person." Ibid. (pp. 27-29)

4. Whether Branch's embargo of the phrase "based on information received" extends to other, broader phrases depends on context. The circumstances here are significantly different than in Branch. Notably, "information received" suggests the existence of an informant, whereas "evidence . . . collected" is a broader phrase that could encompass other types of evidence. Perhaps most importantly, Abate repeatedly told the jury that no one other than Rafferty and Rivera came forward to give a statement. Viewed in that light, "the logical implication" of Abate's testimony was that "the evidence that [he] collected" referred to evidence other than hearsay. Given the other evidence in the record, the Court finds Abate's testimony did not compel the inference that he had superior knowledge incriminating defendant from a non-testifying witness. (pp. 30-31)

5. The Court provides the following guidance. Although the admission of Abate's testimony here was not an abuse of discretion, the Court cautions against using the phrase "based on the evidence collected" in this context. Such language can potentially sweep in inadmissible hearsay. When the State improperly lays the foundation for an officer's testimony about a photo identification, the trial court should promptly give a curative instruction to direct the jury's attention away from evidence outside of the record. Finally, information gathered during police investigations that leads to the development of a suspect is not subject to the hearsay rule. To the extent the Appellate Division decision created limitations on photo arrays, the Court does not adopt them. (pp. 32-33)

**REVERSED and REMANDED to the Appellate Division.**

**JUSTICE ALBIN, dissenting,** expresses the view that defendant was denied a fair trial. In Justice Albin's view, nothing in the admissible evidence before the jury suggested that, at the time the officer constructed the array, he had a reasonable basis to consider Medina a suspect. The jury, therefore, was left to infer that the officer had superior knowledge from outside the record that targeted Medina as a suspect. Justice Albin explains that Abate's impermissible testimony that Medina "was a suspect in the eyes of the police [based on the evidence collected] may have tipped the scales." See Branch, 182 N.J. at 354. Justice Albin would affirm and remand for a new trial.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion. JUSTICE ALBIN filed a dissent.**

3

SUPREME COURT OF NEW JERSEY

A-67 September Term 2018

081926

State of New Jersey,

Plaintiff-Appellant,

v.

Jose Medina,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| March 16, 2020 | June 9, 2020 |

Frank J. Ducoat, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause
for appellant (Theodore N. Stephens, II, Acting Essex
County Prosecutor, attorney; Frank J. Ducoat and
Tiffany M. Russo, Special Deputy Attorney
General/Acting Assistant Prosecutor, of counsel and
on the briefs).

Robert Carter Pierce argued the cause for respondent
(Robert Carter Pierce, on the briefs).

Adam D. Klein, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New
Jersey (Gurbir S. Grewal, Attorney General, attorney;
Adam D. Klein, of counsel and on the brief).

1

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

JUSTICE TIMPONE delivered the opinion of the Court.

Defendant Jose Medina was tried and convicted for offenses related to a non-fatal slashing that occurred outside of a bar in the Township of Belleville. Although no physical evidence linked defendant to the crime, surveillance footage captured the incident, and the victim selected defendant's picture from a photo array. A woman who witnessed the attack identified defendant as the attacker to police but was unwilling to give a formal statement or testify.

At defendant's trial, the prosecutor referenced the anonymous woman, after which an officer testified that, based on the "evidence . . . collected," he included defendant's picture in the photo array. Relying on State v. Bankston, 63 N.J. 263 (1973), State v. Irving, 114 N.J. 427 (1989), and State v. Branch, 182 N.J. 338 (2005), the Appellate Division found that this testimony violated the hearsay rule and the Confrontation Clause by suggesting that the anonymous woman -- a non-testifying witness -- implicated defendant in the crime. Viewing the trial record in its entirety, however, we find that the

2

officer's testimony did not generate such an inference. Accordingly, we reverse the judgment of the Appellate Division.

## I.

We discern the following facts from the pretrial hearing on the State's motion in limine and the trial record.

## A.

On the night of December 27, 2013, Anthony Rivera and four friends, including Tommy Rafferty, went to Speakeasy's, a bar in the Township of Belleville. After two or three beers, Rivera and Rafferty stepped outside for a cigarette. On their way out, Rivera held the door to let two women into the bar. As soon as he stepped through the doorway, a man slashed him across the face with a box cutter and said, "[D]o you remember me[?]" The attacker approached again but another man intervened and the attacker fled.

Police arrived a short while later and spoke with Rivera. Rivera stated that his attacker was about thirty years old, five foot seven, 180 pounds, and wore a gray sweatshirt. Rivera said the man was Hispanic and either bald or had short hair. Rivera also indicated that he did not know his attacker but could identify him if he saw him again. Police noted that Rivera did not seem intoxicated at the time, and escorted him to the hospital where he received forty-one stitches for the thirteen-centimeter laceration on his left cheek.

Meanwhile, officers spoke with a woman at the scene who wished to remain anonymous. She identified the attacker as defendant Jose Medina and showed the police one of defendant's Instagram pictures and his username. In addition, Rafferty went with police to the Belleville Police Station to give a formal videotaped statement. Like Rivera, he described, but could not identify, the attacker.

The next day, the responding officers apprised Belleville Detective Anthony Abate of what they learned at Speakeasy's. Abate also viewed surveillance footage from the bar, which depicted Rivera holding the door for the women and the slashing. The assailant's face was not visible on the tape. Abate also ran a background check and found that defendant's picture matched Rivera's and Rafferty's descriptions, as well as the Instagram photo shown to police by the anonymous woman. Abate then prepared a photo array that included defendant's picture.

Later that afternoon, Rivera went to the police station to give a formal videotaped statement. With the shock of the attack having worn off, Rivera gave Abate a more specific description of his assailant: light-skinned Hispanic male wearing jeans and a gray hooded-sweatshirt with a yellow stripe, stocky build, no tattoos, a "real, real thin" beard, and "real-short," "low-cut" hair. Rivera repeated that he could make an identification if given the opportunity.

4

This time, however, Rivera added that he thought he recognized his attacker from a recent brawl at Yesterday's Bar and Grille (Yesterday's) in Clifton, but he could not be certain. In Rivera's view, that explained why the attacker said "do you remember me."

Rivera and defendant were, in fact, involved in a group fight at Yesterday's roughly six weeks before the night of the attack. Unbeknownst to the participants, an unidentified individual posted a video of the fight on YouTube. Of the two men, defendant is the only one depicted because Rivera did not participate in the recorded portion of the fight. Nevertheless, Rivera later testified that he hit someone over the head with a bottle during the fight at Yesterday's and that both he and defendant "threw some punches," but that Rivera could not be sure if they made contact with one another. For his part, defendant told an officer who responded to Yesterday's that he was struck on the head with what he thought was a bottle.

After Rivera gave his second statement, Sergeant Edward Zimmerman served as a blind administrator to conduct the photo array. Looking at the pictures prepared by Abate, Rivera identified defendant as the attacker. Zimmerman later testified that Rivera "was confident" in his selection and did not need to see any pictures a second time. No further leads developed, and

5

Abate obtained a warrant for defendant's arrest. Defendant subsequently turned himself in to the Belleville Police Department.

## B.

On September 24, 2014, an Essex County grand jury indicted defendant for second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2).

Before trial, the State filed an in limine motion seeking a number of pre-trial evidentiary rulings. As part of this motion, the State sought leave to admit the YouTube video of the brawl at Yesterday's, arguing it was admissible under N.J.R.E. 404(b) in order to establish defendant's identity and motive to assault Rivera. Separately, the State recognized that relaying the anonymous woman's identification to the jury could violate the hearsay rule and defendant's confrontation right under the State and Federal Constitutions. Therefore, the State also requested permission for Abate to testify that he compiled the photo array "based on information received," which would give the jury enough context to understand that there was a fulsome investigation leading to defendant's arrest without actually disclosing the anonymous woman's statements.

6

Defendant filed a letter brief in opposition challenging the introduction of the YouTube video. Defendant further disputed the State's suggested use of the phrase "based on information received" because it would violate the precepts of Branch.

The trial judge conducted an N.J.R.E. 104 hearing at which four witnesses testified. The judge found the YouTube video was "inadmissible under [N.J.R.E.] 404(b), but yet [was] admissible predicated upon [N.J.R.E] 803(a) and . . . prior identification of a person as analyzed in State v. Henderson, 208 [N.J.] 208, 261[] (2011)." The judge did not rule on the issue of Abate's testimony on the record.

At trial, Rivera identified defendant as his attacker. The State also called Abate to testify. During Abate's direct examination, the prosecutor paused and asked the judge for a sidebar to discuss the photo array. The judge advised the prosecutor that Abate "can't speak as to what information [the anonymous woman] gave him, it's hearsay." The prosecutor then resumed questioning:

> Q: Detective, after speaking with the officers who had done the crime scene, did they tell you that they had spoken with some witnesses?
>
> A: Yes.
>
> Q: Including one --

7

[Defense counsel]: Judge, at this point -- this is like double hearsay.

The Court: He's just gonna say whether he talked to them, not what they said but whether he talked to them.

Q: I'm not asking what they said but they spoke, for example, with one female who didn't want to get involved --

The Court: Overruled. Go ahead.

Q: They spoke with one female who didn't want to get involved. Correct?

A: Correct.

Q: Don't tell me what they said.

A: Correct.

Q: Okay. They spoke with another individual by the name of Tom Rafferty. Correct?

A: Correct.

Q: And they intended to speak with other people, as well, to no avail. Correct?

A: Correct.

Q: Now, when -- were any witnesses -- or, specifically, of the witnesses -- Mr. Rafferty was the only one who was willing to come in and give a statement. Correct?

A: Correct.

8

Q: Did you take a statement from him?

A: Yes.

Q: And aside from taking his statement, did you take anyone else's statement in the case?

A: In the whole entire case?

Q: In the case, yes?

A: Ah, yes, I did.

Q: And who was that?

A: The victim.

. . . .

Q: Now, what other investigative steps did you take to try to uncover any evidence of what had happened?

A: Ah, additional things were -- we a -- we were able to obtain surveillance footage from the --

. . . .

Q: And so you did actually obtain a copy of the surveillance footage. Correct?

A: Yes.

[(emphases added).]

9

The judge then adjourned the trial for a break, after which the State played the surveillance footage for the jury. Next, Abate explained that both Rivera and Rafferty came to the police station to give formal videotaped statements. Abate also told the jury that Rivera provided a description of the attacker and said that he could identify the attacker if he saw him again. At that point, the prosecutor asked,

> Q: <u>And based on -- at this point the evidence that you collected, did you have a suspect?</u>
>
> A: Yes.
>
> Q: And who was that suspect?
>
> A: Jose Medina.
>
> Q: Now, what was -- once he told you he could make an identification, what was the next step that you took with that information?
>
> A: Generated a photo lineup.
>
> [(emphasis added).]

Later, the prosecutor asked Abate, "when [he] put together this array," whether he was "going based in any way on [his] viewing of the surveillance footage," to which Abate replied affirmatively. In addition, Abate indicated that he only obtained formal statements from Rivera and Rafferty because "there was nobody else that wanted to come forward umm to give a statement,

10

any witnesses or anything like that.  And that -- that's really who -- who the other people that we would take statements from."

During cross-examination, defense counsel elicited from Abate that Rivera could not definitively say whether he saw defendant before the attack. Defense counsel then continued:

> Q:  So, was any physical evidence recovered?  A knife?
>
> A:  No.
>
> Q:  No knife was recovered.  Correct?
>
> A:  Correct.
>
> . . . .
>
> Q:  No physical -- from the slashing.  No physical evidence was recovered.  Is that correct?
>
> A:  Correct.
>
> Q:  No forensic evidence.  Is that correct?
>
> A:  Correct.
>
> Q:  No fingerprints, no DNA, no weapon.  Correct?
>
> A:  Correct.
>
> Q:  And the person you spoke to regarding the incident, or the people, specifically were Thomas Rafferty.  Is that correct?
>
> A:  Correct.

11

Q: And Mr. Rivera. Is that correct?

A: Correct.

Q: Now, when Thomas Rafferty gave you the statement, he couldn't make an identification. Is that correct?

Defense counsel then presented the jury with Rafferty's statement, in which he described the attacker but said, "I never saw the kid before in my life."

On redirect, the prosecutor sought to clarify the scope of the police investigation for the jury:

Q: Now, you testified earlier that you also spoke with -- or not you, but officers at the scene did manage -- and don't tell me what anyone said at the scene -- but they managed to speak with one person, a female, who wished to remain anonymous, didn't want to give a statement. Correct?

A: Correct.

Q: They also spoke, obviously, with Mr. Rafferty who was willing to come in, give a formal statement. Correct?

A: Correct.

Q: And, again, I think you answered this but why didn't you take formal statements from anyone else?

A: Because nobody else ah, volunteered to give any statements.

12

Q: Okay. But to your knowledge, did the other officers question other people at the scene and attempt to speak with other people?

A: I believe so, yes.

[(emphases added).]

The final reference to the anonymous woman occurred during the prosecutor's summation, in which he emphasized the challenges posed by eyewitnesses who decline to assist the police:

> Now, let's also talk about the investigation, itself, very briefly. The investigation, itself, we had the witness, Mr. Rivera. The officers can't control who stays at the scene, who doesn't stay at the scene. They're coming there after the fact. The officers not only can't control who stays at the scene, they can't control who talks to them, who doesn't. Who's willing to give a truthful and honest account of what happened, and who doesn't.
>
> We know from . . . Detective Abate[] that officers attempted to speak with everyone at the scene, and anyone who's willing to provide information, they took information from. [Rafferty], unfortunately, didn't actually witness the incident. He was willing to give a statement, which you'd expect. He was the victim's friend, so he's willing to at least go in and give a statement. Officers attempted to speak with other people. <u>You heard testimony that they spoke even with some anonymous female that didn't want to give a statement, and wouldn't even give her name when she spoke with the officers.</u>

People didn't want to get involved. Officers can't control that. You don't fault the investigation on the fact that people don't want to cooperate, they disappear, they don't want to talk.

[(emphasis added).]

The jury convicted defendant on all charges and the judge sentenced him to seven years' imprisonment with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

## C.

Defendant appealed his convictions, and the Appellate Division reversed and remanded for a new trial because "the misapplication of the rules of evidence permitted the introduction of materially incompetent evidence that irreparably tainted the reliability of the jury's verdict." According to the court, "[t]he first serious error occurred when the investigating officer relied on unverifiable hearsay statements from an unidentified woman to create the photo[ ]array." The court found that investigatory practice problematic because Rivera's identification of defendant "was the principal legal issue at trial and the only evidence directly linking him to the assault." And, absent the photo array based on "unverifiable information from an anonymous non-testifying individual," Rivera would have been unable to identify defendant.

14

The Appellate Division also took issue with Abate's testimony. In the court's view, telling the jury that police spoke with the anonymous woman and thereafter generated a photo array constituted reversible error. Relying on Bankston, Irving, and Branch, the court explained that, when an officer conveys incriminating information from a non-testifying witness, the State violates the hearsay rule and defendant's confrontation right. As the court put it, "[a]lthough the precise information this unidentified individual relayed to the police was not revealed at trial, Detective Abate's testimony provided a sufficient basis from which the jury could infer it supported the State's case against defendant." In light of the "magnitude" of those errors, the court reversed and remanded without consideration of defendant's four remaining arguments.

This Court granted the State's petition for certification. 237 N.J. 419 (2019). We further granted leave to the Attorney General of New Jersey and the New Jersey Office of the Public Defender to appear as amici curiae.

## II.

### A.

The State asserts that the Appellate Division erroneously reversed defendant's convictions based on a misapplication of our case law to the facts of this case. Stressing that Abate's references to the anonymous woman were

brief, inconsequential, and detached in time, the State argues that those references did not create an "inescapable inference" that she incriminated defendant to police, as Bankston requires. (quoting Bankston, 63 N.J. at 271). The State also distinguishes Irving on the ground that, here, Abate and the prosecutor did not allude to information contained in impermissible hearsay, but rather limited their commentary to the lack of witness cooperation. And the State faults the Appellate Division's reliance on Branch, in which there was no trial testimony or evidence that could have steered police toward the defendant, leaving the jury to speculate that the detective had superior knowledge of the defendant's guilt via hearsay. Here, the State contends, there were other sources of information that the jury could assume were used to create the photo array. Finally, the State argues that the Appellate Division conflated Medina's rights under Bankston and the Confrontation Clause of the Sixth Amendment with permissible methods used by law enforcement to create a photo array, and asks that we clarify that the hearsay rule and Confrontation Clause apply at trial, not during an investigation.

The Attorney General agrees with the State that the jury had no reason to assume that the anonymous woman implicated defendant to police. Instead, the Attorney General suggests the only logical implications to be drawn from Abate's testimony were that (1) the anonymous woman was a "dead-end

16

witness" whose interaction with police "was of no moment at all," and (2) Abate "created the photo array using Rivera's description, the footage, and his law-enforcement expertise and resources."

The Attorney General cautions that the Appellate Division's decision needlessly expands Bankston's restrictions and would preclude the State from demonstrating that police conducted a complete investigation -- an important facet of the prosecution's presentation in a criminal case -- by asking officers about their attempts to speak with witnesses.

Finally, the Attorney General argues that plain error review applies because defendant never objected to Abate's testimony about the photo array and the trial judge never ruled on the issue of Abate's testimony at the Rule 104 hearing. And the conduct at issue here did not rise to the level of plain error, the Attorney General contends, in light of the other evidence adduced at trial.

### B.

In response, defendant argues that the State's testimony about the anonymous woman and ensuing use of the phrase "based on . . . the evidence that you collected" violated defendant's confrontation right and the hearsay rule by impermissibly creating the sort of "inescapable inference" prohibited under Bankston and its progeny. Defendant also asserts that the State's

17

testimony violated <u>Branch</u>, which forestalls any explanation as to why the police included a suspect's picture in a photo array -- beyond evidence that the police fairly assembled the photo array and that the process led to a reliable identification -- in the absence of alleged police misconduct.

Defendant additionally suggests we apply the abuse of discretion standard rather than review for plain error, noting defense counsel's objection to the first reference to the anonymous woman at trial and opposition to the State's motion in limine. Defendant alternatively argues that, regardless of the standard of review, reversal is warranted here considering the impermissible inference created through reference to the anonymous woman.

In support of defendant's position, the Public Defender adds three points. First, phrases such as "upon information received" or "based on . . . the evidence that you collected" are just as suggestive that the testifying officer has superior, extra-record knowledge about a defendant's guilt as a direct quote from the non-testifying witness. Second, the scope of <u>Branch</u> should be extended by prohibiting any reference to evidence from outside the record in an identification case. Third, by eliciting information about the anonymous woman while simultaneously trying to avoid introducing hearsay, the State misrepresented the real reason why police identified Medina as a

18

suspect and put his picture in the photo array, in potential violation of Rule of Professional Conduct 3.4(e).

### III.

As a preliminary matter, we note that the parties disagree about which standard of review applies: plain error or abuse of discretion. Because defendant did, in fact, object to Abate's use of the phrase "based on information received" before trial, cf. State v. Santamaria, 236 N.J. 390, 404 (2019) (noting plain error review applies in the absence of an objection), we will employ the abuse of discretion standard as we do for all evidentiary rulings, see State v. Prall, 231 N.J. 567, 580 (2018).

Under that deferential standard, we review a trial court's evidentiary ruling only for a "clear error in judgment." State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). We do not substitute our own judgment for the trial court's unless its "ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

### IV.

Turning to the merits of the case, we first apply the legal principles that govern references to non-testifying witnesses and then consider limits on testimony specific to photo arrays.

19

A.

1.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront "the witnesses against him." That right is "an essential attribute of the right to a fair trial," Branch, 182 N.J. at 348, and secures for a defendant the "fair opportunity to defend against the State's accusations," State v. Garron, 177 N.J. 147, 169 (2003) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)).

"For that reason, the Sixth Amendment right of confrontation 'expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination.'" State v. Basil, 202 N.J. 570, 591 (2010) (quoting State in Interest of J.A., 195 N.J. 324, 342 (2008)). Indeed, "[o]ur legal system has long recognized that cross-examination is the 'greatest legal engine ever invented for the discovery of truth.'" Ibid. (quoting California v. Green, 399 U.S. 149, 158 (1970)). And, in light of the value it places on cross-examination, the Confrontation Clause prohibits the introduction of testimonial hearsay that does not meet "[a]n established and recognized exception to the hearsay rule," Branch, 182 N.J. at 349, and cannot

20

be challenged by a defendant through cross-examination, Basil, 202 N.J. at 591; accord Crawford v. Washington, 541 U.S. 36, 53-59 (2004).

Beginning with our decision in Bankston, we have applied the above principles to protect criminal defendants "from the incriminating statements of a faceless accuser who remains in the shadows and avoids the light of court." Branch, 182 N.J. at 348. In Bankston, police entered a tavern and found heroin on the bar under a pair of gloves near where the defendant had been sitting. 63 N.J. at 265. Police arrested him and, at his trial, a detective testified that the defendant fit an informer's description of a person with narcotics in the tavern. Id. at 266. The prosecutor also emphasized the significance of this testimony in his summation, bolstering the State's case. Id. at 267.

In evaluating the detective's testimony, we first noted that the use of neutral phrases to explain an officer's conduct, such as the officer approached a suspect "upon information received," does not violate the hearsay rule because they are admissible to show "the officer was not acting in an arbitrary manner or to explain his subsequent conduct." Id. at 268. We stressed, however, that, "when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused," the testimony violates both the hearsay rule and the defendant's confrontation right. Id. at

21

268-69. We added that, even where the officer does not reiterate what he learned from a third party, "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 271.

Applying those principles, we found that, although the detective never repeated what he learned from the informer, the "inescapable inference" from his testimony was that the "unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime." Ibid. Yet "there was no need for any reference to an informer" because "[t]here was no allegation that the police were acting arbitrarily." Id. at 272. Accordingly, we held that "[t]he testimony was clearly hearsay" and its prejudicial effect -- further augmented by the prosecutor -- required reversal. Id. at 271, 273.

Later, in Irving, we considered a detective's testimony in connection with the investigation of an armed robbery. 114 N.J. at 431, 445. In that case, the detective stated that, after the crime, he "canvassed the neighborhood, basically put the word out of what happened and if anybody had any information to call [him] at the robbery squad." Id. at 445. The detective then replied affirmatively when asked whether, before the date of the defendant's

22

arrest, he "receive[d] some information." Ibid. He explained to the jury that he "followed up on the information [he] received, [then] obtained from the gallery [a] photo [based on the] information received and made a photo array" that included the defendant's picture. Ibid. As in Bankston, the prosecutor's summation "emphasiz[ed] the value of the information received" by the detective. Ibid.

We repeated our instructions from Bankston that neutral phrasings such as "upon information received" are permissible to show an officer was not acting arbitrarily, whereas repeating incriminating information from a non-testifying witness violates the hearsay rule, as well as our admonition that the "specific hearsay statement" need not be repeated to create an impermissible inference of guilt if "the logical implication to be drawn from the testimony" is that the informant incriminated the defendant. Id. at 446 (quoting Bankston, 63 N.J. at 271). Indeed, "the creation of the inference, not the specificity of the statements made, was the critical factor in determining whether [the] hearsay [rule] was violated." Id. at 447.

Ultimately, we found the detective's testimony was improper, reasoning that he created an "inescapable inference, although never specifically stated, . . . that an informant had told [him] that [the] defendant committed the crime." Id. at 446-47. We attributed significance to the detective's testimony

23

that, after canvassing the neighborhood and asking for leads, he placed the defendant's picture in the array. Id. at 446. We found the circumstances similar to Bankston, namely, that (1) "there was no need for any reference to an informer" absent an allegation the detective acted arbitrarily and (2) the prosecutor's summation bolstered the detective's testimony. Id. at 447.

Still, defense counsel in Irving failed to timely object to the improper testimony. Ibid. We affirmed the defendant's convictions based on the other evidence adduced at trial, holding that the detective's testimony did not constitute plain error. Id. at 448; see also State v. Roach, 146 N.J. 208, 224-26 (1996) (relying on Bankston and Irving to find that an officer's testimony -- that information from co-defendants and a jailhouse informant made the defendant a suspect -- was improper even though the officer did not repeat what he learned, but also finding the error harmless).

Under Bankston and Irving, an officer may not disclose incriminating information obtained from a non-testifying witness. Even when an officer does not specifically repeat that information, the officer may not create an "inescapable inference" that an unavailable source has implicated the defendant. Bankston, 63 N.J. at 271. Either method of relaying hearsay generates "[t]he vice Bankston and its progeny seek to eradicate": "the implication that a testifying police officer somehow is in possession of

24

superior knowledge than what is presented to the jury and, hence, his testimony is worthy of greater weight." State v. Kemp, 195 N.J. 136, 155 (2008).

2.

Here, it is undisputed that Abate never repeated to the jury what the anonymous woman told officers. Therefore, his testimony would only conflict with the principles derived from Bankston and Irving if his references to her otherwise created an "inescapable inference" that she incriminated defendant to police. Bankston, 63 N.J. at 271.

Yet, Abate did not imply that the woman gave police any information at all. He referenced the anonymous woman twice: once on direct examination and again on redirect examination. In the first instance, he agreed with the prosecutor that she "didn't want to get involved," and in the second, he agreed that she "didn't want to give a statement." Abate also explained that he obtained formal statements only from Rivera and Rafferty because "there was nobody else that wanted to come forward . . . to give a statement, any witnesses or anything like that." Moreover, unlike the prosecutors in Bankston and Irving who emphasized the importance of the non-testifying witness's incriminating information, the prosecutor's summation here highlighted that

25

police tried to speak with witnesses at the scene -- including the anonymous woman -- but none wanted to get involved.

The record substantiates the Attorney General's contention that the jury likely considered the anonymous woman to be a "dead-end witness."  The State not only was careful not to repeat what she told police, but also went to great lengths to suggest that she was not forthcoming.  Additionally, the references to the anonymous woman would have seemed less significant than the other relevant evidence in the record.  Both Rivera and Rafferty gave descriptions of the attacker that matched defendant's picture; the surveillance video captured the incident; and Rivera unwaveringly identified defendant both at trial and in the array.  In sum, we find that the references to the anonymous woman did not create an "inescapable inference" that she implicated defendant in the attack to the police.  Bankston, 63 N.J. at 271.

We further agree with the State that the Appellate Division inappropriately expanded Bankston's requirements by finding Abate's testimony improper because the jury "could infer it supported the State's case against defendant."  In Bankston, we expressly noted that we were unconcerned "with mere possible inferences" to be drawn from an officer's testimony.  Ibid.  What matters is that Abate's testimony did not create the "inescapable inference" that he had superior information about defendant's

guilt from the anonymous woman.  Ibid.  With that in mind, we hold that Abate's testimony did not violate defendant's confrontation right or the hearsay rule under Bankston.

We turn next to defendant's contention that Abate's testimony violated the guidelines particular to officer testimony about photo arrays set forth in Branch.

B.

1.

In Branch, Kathleen O'Nieal was talking with a family friend, Joseph Gannon, when she heard screams from upstairs where her twin children were sleeping.  182 N.J. at 343.  An intruder sucking on a lollipop came down the stairs, ran past the two adults, and tried to escape through the back door in the kitchen.  Ibid.  The door handle jammed, but after a brief delay in which he fended off Gannon, the intruder opened the rear door and fled.  Ibid.

Police were unable to develop any physical evidence from the scene, but they did take descriptions of the suspect from the four witnesses.  Id. at 344. Two days later, Gannon met with a police sketch artist to prepare a sketch of the suspect.  Id. at 345.  The detective assigned to the case then prepared a photo array.  Ibid.  However, O'Nieal and Gannon were unable to identify the suspect from the array.  Ibid.  The next day, the detective prepared a second

array, and both O'Nieal and Gannon independently selected the defendant's picture. Ibid. They also identified the defendant at trial. Ibid. Importantly, the defendant's appearance both in his picture and at trial differed markedly from the witnesses' descriptions and the sketch. Ibid.

At trial, the prosecutor asked the detective, "[B]ased on information received did you develop a suspect in this case?" Id. at 347 (emphasis omitted). The detective replied affirmatively and, when asked who that was, named the defendant. Ibid.

On appeal, we considered whether that testimony violated the defendant's confrontation right and the hearsay rule. Id. at 348-53. Reviewing Bankston, Irving, and a relevant decision from the Appellate Division, State v. Tilghman, 345 N.J. Super. 571 (App. Div. 2001), we explained that "[t]he common thread that runs through [those cases] is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

Yet, in the context of photo identifications, we retreated from our earlier approval in Bankston and Irving of the use of neutral phrases -- such as that an officer developed a photo array or identified a suspect "based on information received" -- to explain an officer's conduct. Id. at 352. We observed that

> [w]hen a police officer testifies concerning an
> identification made by a witness, such as in this case,

28

what counts is whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification. Why the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial. For that reason, we disapprove of a police officer testifying that he placed a defendant's picture in a photographic array "upon information received." <u>Even such seemingly neutral language, by inference, has the capacity to sweep in inadmissible hearsay. It implies that the police officer has information suggestive of the defendant's guilt from some unknown source.</u>

[<u>Ibid.</u> (emphasis added) (citation omitted).]

Accordingly, we limited the use of the phrase "based on information received" to "contexts other than a photographic identification," and "only if necessary to rebut a suggestion that [the officer] acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person." <u>Ibid.</u>

As applied in <u>Branch</u>, the detective's use of that phrase was "not relevant and . . . highly prejudicial," because it "implied that he had information from an out-of-court source, known only to him, implicating [the] defendant in the burglary." <u>Id.</u> at 352-53; <u>see also, e.g.</u>, <u>State v. Lazo</u>, 209 N.J. 9, 15, 21-22 (2012) (finding <u>Branch</u> error where a detective's testimony that he placed the defendant's picture in a photo array "because of his similarities to the victim's description" unfairly bolstered the witness's identification).

29

2.

Here, Abate testified that he placed defendant's picture in the array because defendant was a suspect "based on . . . the evidence that [Abate] collected." The question this case presents is whether Branch's embargo of the phrase "based on information received" extends to other, broader explanatory phrases. The answer, we find, depends on the context of the testimony. That is, whether a jury would likely be compelled by a lack of record evidence to infer from the officer's use of the phrase that the officer "possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

In Branch, we were troubled not by the inherently inflammatory nature of the phrase "based on information received," but the use of that language given the lack of physical evidence in the case and the fact that the sketch and the witnesses' descriptions of the defendant resembled neither his appearance on the day of his arrest nor the picture of him in the array. Id. at 345-47. In the absence of anything else tying the defendant to the crime, the jury could easily have inferred that the "information received" by the detective was from a non-testifying witness. Id. at 352-53.

The circumstances here are significantly different. Notably, "information received" suggests the existence of an informant, whereas

"evidence . . . collected" is a broader phrase that could encompass other types of evidence. Abate used that phrase after (1) he explained that Rafferty and Rivera gave formal statements, (2) the jury watched the surveillance footage taken at Speakeasy's, and (3) he read Rivera's description of the attacker. Abate also later clarified during his testimony that he had personally watched the surveillance footage before assembling the photo array. Abate further explained that Rivera told him that the fight at Yesterday's likely involved the culprit in the slashing before Rivera identified defendant's picture in the array. And, perhaps most importantly, Abate repeatedly told the jury that no one other than Rafferty and Rivera came forward to give a statement. Viewed in that light, "the logical implication" of Abate's testimony was that "the evidence that [he] collected" referred to evidence other than hearsay: the surveillance footage and Rivera's and Rafferty's formal statements and descriptions of the attacker. Bankston, 63 N.J. at 271.

Despite our dissenting colleague's suggestion to the contrary, see post at ___ (slip op. at 6-7), we find it reasonable that the jury believed the record evidence led Abate to place defendant's picture in the array. Given the other evidence in the trial record, then, we find that Abate's testimony did not compel the inference that he had superior knowledge incriminating defendant from a non-testifying witness.

31

3.

Notwithstanding our ruling that the admission of Abate's testimony was not an abuse of discretion, we reiterate that the best practice is to avoid explaining that a defendant's picture was placed in a photo array because he or she was a suspect or "based on information received." See Branch, 182 N.J. at 352 ("Why the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial."). We also caution against using the phrase "based on the evidence collected" in this context. As in Branch, such language can potentially sweep in inadmissible hearsay by producing the "inescapable inference" that the officer obtained incriminating information about the defendant beyond the scope of the record. Bankston, 63 N.J. at 271. For instance, if Abate had simply testified that officers spoke with the anonymous woman and, "based on . . . the evidence that [he] collected," he placed defendant's picture in the array -- without reference to any other forms of evidence -- then the "logical implication" from Abate's testimony would have been that the anonymous woman implicated defendant to police. Ibid.

C.

Fundamentally, we find the admission of Abate's testimony was not an abuse of discretion considering the entirety of the record before us, and we

32

therefore reverse the judgment of the Appellate Division. We nevertheless caution that, going forward, when the State improperly lays the foundation for an officer's testimony about a photo identification, the trial court should promptly give a curative instruction to direct the jury's attention away from evidence outside of the record.

V.

Finally, we briefly address the portion of the Appellate Division's decision suggesting the police should not use hearsay information to assemble a photo array.

Information gathered during police investigations that leads to the development of a suspect is manifestly different from admissible information that the State may present in court. Only the latter is subject to the hearsay rule. See N.J.R.E. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" (emphasis added)). Limits on the State's ability to generate a reliable photo array stem from a number of our decisions. See, e.g., State v. Green, 239 N.J. 88, 98-100, 105-08 (2019); Henderson, 208 N.J. at 251-52; State v. Delgado, 188 N.J. 48, 63 (2006). To the extent the Appellate Division created additional limitations, we do not adopt them.

33

VI.

The judgment of the Appellate Division is reversed and the matter is remanded to the Appellate Division to consider the four arguments that remain from defendant's brief to that court.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion. JUSTICE ALBIN filed a dissent.

State of New Jersey,

Plaintiff-Appellant,

v.

Jose Medina,

Defendant-Respondent.

JUSTICE ALBIN, dissenting.

I part with the majority because, I believe, defendant was denied a fair trial based on this Court's jurisprudence, which is intended to ensure that a defendant is not wrongfully convicted based on a misidentification.

In State v. Branch, this Court made a simple yet constitutionally significant pronouncement to protect the confrontation and fair-trial rights of a defendant when the State presents testimony of an identification made from a photographic array.  182 N.J. 338 (2005).  We instructed that a police officer should not testify that he placed the defendant's photograph in the array because the defendant was a suspect based "upon information received."  Id. at 342, 352.  We barred such testimony because it might "imply to the jury that [the officer] possesses superior knowledge, outside the record, that incriminates the defendant" and because the officer's "reasons for including [the] defendant's photograph in the array [are] not relevant and [are] highly

1

prejudicial." Id. at 351, 352; see also State v. Lazo, 209 N.J. 9, 22 (2012) (holding that the detective's explanation for placing the defendant's photo in an array was irrelevant and violated the dictates of Branch).[1] We also noted that such testimony has the capacity to improperly bolster the witness's identification and thus invade the jury's role. See Branch, 182 N.J. at 350-51.

Despite that clear warning in Branch, the prosecutor in this case proceeded to do precisely what this Court forbade -- the prosecutor elicited that the investigating officer placed defendant Jose Medina's photograph in the photographic array because Medina was "a suspect" based on evidence the officer had collected. But nothing in the admissible evidence before the jury suggested that, at the time the officer constructed the array, he had a reasonable basis to consider Medina a suspect. The jury, therefore, was left to infer that the officer had superior knowledge from outside the record that targeted Medina as a suspect.

The truth is that the officer placed Medina's photograph in the array as a suspect because an unnamed woman at the scene of the assault told the police

---

[1] In Lazo, the detective testified that he placed the defendant's photograph in the array "[b]ecause of his similarities to the suspects that were described by the victim." 209 N.J. at 19. We concluded the detective's testimony not only violated Branch, but also constituted "improper lay opinion testimony" that "enhanced the victim's credibility and intruded on the jury's role." Id. at 21-22.

2

that Medina was the assailant and showed the police his Instagram profile. Because the police did not hold the woman as a material witness and because she was not subject to direct or cross-examination, we do not know whether she actually witnessed the assault, whether she had the ability to observe the events, or whether she had questionable motives. For those reasons, the information was inadmissible hearsay and not presented to the jury.

The Appellate Division cannot be faulted for overturning Medina's conviction by faithfully applying the law developed by this Court -- by honoring Medina's confrontation rights and fair-trial rights. In reversing the Appellate Division and reinstating Medina's conviction, the majority does not adhere to the principles laid out in Branch. I therefore respectfully dissent.

I.

A.

In Branch, the defendant was convicted of burglarizing a home and robbing its residents. 182 N.J. at 346. Without any corroborating forensic evidence tying the defendant to the crimes, the State's case rested primarily on the victims' photographic identifications of the defendant. Id. at 346-47, 353. In response to the prosecutor's questioning, the investigating detective gave his reasons for including the defendant's picture in the photographic array:

3

[Prosecutor]: Now, after that day, after April 22nd, 1998, based on information received did you develop a suspect in this case?

[Detective]: Yes, I did.

[Prosecutor]: And who was that person?

[Detective]: Mr. Alexander Branch.

[Prosecutor]: And did you obtain a photo array containing Alexander Branch's photograph?

[Detective]: Yes, ma'am.

[Id. at 347.]

Though no objection was raised to this line of questioning, we reversed the defendant's convictions on the basis of plain error. Id. at 353-54. We did so because the detective's "hearsay testimony violated [the] defendant's federal and state rights to confrontation as well as our rules of evidence." Id. at 348. In Branch, like here, "there was no trial testimony or evidence, other than [the] identifications, that could have led [the detective] to focus on [the] defendant as a suspect," and therefore "the jury was left to speculate that the detective had superior knowledge through hearsay information implicating [the] defendant in the crime." Id. at 347-48. We held that "[t]here was no legitimate need or reason for [the detective] to tell the jury why he placed [the] defendant's picture in the photographic array" and that "[t]he only relevant evidence was the identification itself." Id. at 348.

4

B.

In this case, when Detective Abate arranged the photographic array for display to the victim, no admissible evidence pointed to Medina as a suspect. The victim, Anthony Rivera, did not know who attacked him, though he believed he would be able to identify him. Rivera had given a generic description of his assailant, a Hispanic male of a size and weight (and of varying hair styles) that fit the profile of hundreds of such males in this State.[2] Moreover, Rivera's friend, Thomas Rafferty, could provide the police with only generic, physical characteristics of the assailant. Rafferty had told the police that he could not make an identification and therefore was not shown a photographic array.

The surveillance video at Speakeasy's, the establishment where Rivera's face was slashed, recorded the incident but "[t]he assailant's face was not visible on the tape." Ante at ___ (slip op. at 4). Rivera was involved in a brawl six weeks earlier at Yesterday's Bar and Grille, where Medina was present as well. The grainy surveillance video at Yesterday's that was posted

_____

[2] Rivera gave two descriptions of his attacker. Immediately following the incident, Rivera described his assailant as a Hispanic male, either bald or with short hair, about thirty years old, five foot seven and 180 pounds, wearing a gray sweatshirt. Ante at ___ (slip op. at 3). Later that day, he described his assailant as a "light-skinned Hispanic male wearing jeans and a gray hooded-sweatshirt with a yellow stripe, stocky build, no tattoos, a 'real, real thin' beard, and 'real-short,' 'low-cut' hair." Ante at ___ (slip op. at 4).

5

on YouTube, however, did not show Rivera, much less Rivera engaged in an altercation with Medina. Medina appeared on the video with at least a dozen other individuals, but not in a conflict with Rivera. Significantly, Detective Abate had no forensic evidence tying Medina to the aggravated assault of Rivera.

Shortly before Detective Abate's testimony about the identification procedure, the detective told the jury that the police had spoken with an anonymous woman at the scene who did not want to get involved. Despite the lack of evidence before the jury linking Medina to the crime, the prosecutor pursued the same colloquy that we condemned in <u>Branch</u>:

> [Prosecutor]: And based on -- at this point the <u>evidence that you collected</u>, did you have a <u>suspect</u>?
>
> [Detective Abate]: Yes.
>
> [Prosecutor]: And who was that <u>suspect</u>?
>
> [Detective Abate]: Jose Medina.
>
> [Prosecutor]: Now, what was -- once he told you he could make an identification, what was the next step that you took with that information?
>
> [Detective Abate]: Generated a photo lineup.
>
> [(emphases added).]

Unlike in <u>Branch</u>, in this case, defense counsel, in a pretrial motion, objected to the line of questioning the prosecutor pursued. <u>See</u> 182 N.J. at

6

353. The record before the jury provided no indication how Detective Abate could have pinpointed Medina as a suspect based on the generic descriptions of the assailant provided by Rivera and Rafferty, the Speakeasy's surveillance video that did not reveal a view of the assailant's face, or the Yesterday's YouTube video that did not show an interaction between Medina and Rivera. In short, Detective Abate's testimony identified Medina as a suspect based on unidentified "collected" evidence. None of the "collected" evidence put before the jury -- before the showing of the photographic array -- pointed to Medina as a suspect, thus leaving the jury with the clear impression that Abate possessed "information suggestive of [Medina's] guilt from some unknown source." See id. at 352.

There is no meaningful distinction between the detective's reference in Branch to information received or Detective Abate's reference here to evidence collected. In both cases, the reference suggested that the detective was privy to information not available to the jury -- that the detective had superior knowledge implicating the defendant.

## II.

We did not set forth the principles in Branch or in Lazo as a "best practice" to be followed by the State. See ante at ___ (slip op. at 32). Those principles are constitutional imperatives that the State must honor. To repeat,

7

"[w]hen a police officer testifies concerning an identification made by a witness . . . what counts is whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification." Branch, 182 N.J. at 352. The colloquy between the prosecutor and Detective Abate about the evidence collected that led to the targeting of Medina as a suspect had the real potential to "to sweep in inadmissible hearsay," implying that Detective Abate had "information from an out-of-court source, known only to him, implicating [Medina] in the [crime]." See id. at 352-53.

Detective Abate's testimony explaining that Medina was a suspect based on evidence "collected" -- evidence never disclosed to the jury -- and giving that explanation as the reason for placing Medina's photograph in the array "[was] of no relevance to the identification process and [was] highly prejudicial." See id. at 352 (emphases added). In labeling Medina as a suspect, moreover, Detective Abate presented "improper lay opinion testimony" that inappropriately buttressed Rivera's identification and credibility, thus intruding on the jury's exclusive role as factfinder. See Lazo, 209 N.J. at 22; see also Branch, 182 N.J. at 350-51.

Medina's conviction rested almost wholly on Rivera's identification. There was no corroborating forensic evidence. Detective Abate's impermissible testimony that Medina "was a suspect in the eyes of the police

8

[based on the evidence collected] may have tipped the scales." See Branch, 182 N.J. at 354. That error had the clear capacity to cause an unjust result.[3] See ibid.

III.

Because Medina's conviction rests on constitutionally infirm identification testimony, I would affirm the Appellate Division and remand this case for a new trial. I therefore respectfully dissent.

---

[3] I agree with Part V of the majority decision that it is permissible for the police to rely on hearsay information as a basis for arranging a photographic array, provided the hearsay information is not elicited before the jury. See ante at ___ (slip op. at 33).

9